# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, <br><br> Plaintiff, <br> vs. <br> SMA ELEVATOR CONSTRUCTION, INC.; S&M CONTROLS, INC.; SCHLAGEL, INC.; BALDOR ELECTRIC COMPANY; BALDOR ELECTRIC COMPANY f/n/a and/or a/k/a DODGE; DODGE a/k/a and/or n/k/a BALDOR ELECTRIC COMPANY, <br><br> Defendants. | Case No. 5:09-CV-04002 MWB <br><br><br> PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF GEORGE J. KORNSTAD UNDER FEDERAL RULE OF EVIDENCE 104(A) – <u>DAUBERT</u> MOTION |

Plaintiff Nationwide Agribusiness Ins. Co., pursuant to LR 7.1, submits this brief in support of its Motion to Exclude Opinion Testimony by George J. Kornstad and states to the Court as follows:

I. APPLICABLE LAW ....................................................................................................... 2

II. MR. KORNSTAD............................................................................................................ 2

A. Mr. Kornstad's Lack of Adequate Education, Training, and Background ........... 2

B. Mr. Kornstad's Unreliable Testimony and Opinions............................................. 3

    1. HOUSEKEEPING ..................................................................................... 4

    2. BEARING TEMPERATURE MONITORING.......................................... 9

    3. DUST CONTROL SYSTEMS AND OIL SYSTEMS............................. 12

    4. BEARING MAINTENANCE AND INSPECTION ................................ 13

    5. INSPECTIONS, RECORDKEEPING AND OPERATIONS PRACTICES.................. 17

III. PRAYER FOR RELIEF ................................................................................................ 18

1

# I. APPLICABLE LAW

Plaintiff incorporates the statement of applicable law set forth in Plaintiff's Brief in Support of Motion to Exclude Expert Testimony of Anthony C. Skipper under Fed. R. Evid. 104(a).

# II. MR. KORNSTAD

### A. Mr. Kornstad's Lack of Adequate Education, Training, and Background

Mr. Kornstad should be prohibited from testifying to opinions expressed in his report in during his deposition. Fed. R. Evid. 702 permits a district court to allow the testimony of a witness whose knowledge, skill, training, experience, or education will assist a trier of fact. United States v. Robertson, 387 F.3d 702 (8th Cir. 2004). Conversely, if the witness lacks knowledge, skill, training, experience, or education concerning the opinions expressed, he or she must be precluded from contaminating the minds of the jury with his or her opinions. Id. Mr. Kornstad lacks sufficient knowledge, skill, training, experience, or education to render many of the opinions expressed in both his report and during his deposition.

A cursory review of Mr. Kornstad's curriculum vitae reveals that he has been noticeably absent from the grain industry in the United States for over 18 years. (Ex. 1, Kornstad CV). While he has spent time recently overseas in Russia, Uganda, and Afghanistan, Mr. Kornstad's last employment in the United States grain industry predates the construction of the Alton facility by 5 years. (Ex.1, Kornstad CV; Ex. 2, Kornstad Dep. 4-5:25-23; 17:9-15). As Mr. Kornstad explained, he has been noticeably absent in the United States since 1993.

> Q. Since 1993, have you been directly involved in any United States grain handling facilities as far as an employment position or consulting position?
> A. Since 1993?

| | Q. | Yes, sir. |
| | A. | No. In 1993 I left the United States and moved to Russia. |

(Ex. 2, Kornstad Dep. 17:9-15).

Mr. Kornstad's lack of recent experience in the United States grain industry is important when one analyzes the opinions he is expressing. Namely, he is offering opinions regarding the alleged fault of a small, rural, Iowa grain elevator. Yet, he has essentially no experience with any such elevators in the last 20 years. When questioned on his knowledge of the types of elevators similar to the Alton elevator in the state, he was simply unable to distinguish between those rural facilities and the large corporate giant facilities such as Cargill. (Ex. 2, Kornstad Dep. 20:14-18).

In addition to his lack of experience in similar settings in the last 20 years, Mr. Kornstad showed his ignorance of the regulations and standards in the grain industry. For instance, Mr. Kornstad does not have a copy of NFPA 61, does not know how long it has been in existence, and claims that it has been "quite some time" since he recalls specifically reading it. (Ex. 2, Kornstad Dep. 47-48:8-10, 22-3). In addition to his lack of familiarity with NFPA 61, Mr. Kornstad knows nothing about NFPA 68. (Ex. 2, Kornstad Dep. 63:5-15). Most importantly, though, is Mr. Kornstad's clear lack of understanding of the OSHA requirements. The specific OSHA requirements will be discussed below in detail. What should become evident to the Court in reviewing Mr. Kornstad's testimony is that he (1) lacks knowledge of the applicable standards and regulations in the grain industry, and (2) lacks knowledge of the grain handling industry in Iowa and specifically rural cooperatives such as Midwest so much so that his opinions on "industry standards" are completely unreliable. Accordingly, Mr. Kornstad should be prohibited from testifying in this matter.

    **B.**    **Mr. Kornstad's Unreliable Testimony and Opinions**

## 1. HOUSEKEEPING

Before directly addressing Mr. Kornstad's opinions, it is important to set forth and clarify for the Court the OSHA industry standard on housekeeping. 29 CFR 1910.272[1] provides:

> (j) Housekeeping.
>
> (1) The employer shall develop and implement a written housekeeping program that establishes the frequency and method(s) determined best to reduce accumulations of fugitive grain dust on ledges, floors, equipment, and other exposed surfaces.
>
> (2) **In addition, the housekeeping program for grain elevators shall address fugitive dust accumulations at priority housekeeping areas**.
>
>> (i) **Priority housekeeping areas shall include at least the following:**
>>
>>> (A) **Floor areas within 35 feet (10.7 m) of inside bucket elevators**;
>>>
>>> (B) Floors of enclosed areas containing grinding equipment;
>>>
>>> (C) Floors of enclosed areas containing grain dryers located inside the facility.
>>
>> (ii) **The employer shall immediately remove any fugitive grain dust accumulations whenever they exceed 1/8 inch (.32 cm) at priority housekeeping areas**, pursuant to the housekeeping program, or shall demonstrate and assure, through the development and implementation of the housekeeping program, that equivalent protection is provided.
>
> (3) The use of compressed air to blow dust from ledges, walls, and other areas shall only be permitted when all machinery that presents an ignition source in the area is shut-down, and all other known potential ignition sources in the area are removed or controlled.

---
[1] The entirety of 29 CFR 1910.272 is provided to the Court as Ex. 12.

> (4) Grain and product spills shall not be considered fugitive grain dust accumulations. However, the housekeeping program shall address the procedures for removing such spills from the work area.
> 29 CFR 1910.272(j).

Importantly, "inside bucket elevators" is defined in section (c) of §1910.272. It defines "inside bucket elevators" as the following:

> "Inside bucket elevator means a bucket elevator that has the boot and more than 20 percent of the total leg height (above grade or ground level) inside the grain elevator structure. Bucket elevators with leg casings that are inside (and pass through the roofs) of rail or truck dump sheds with the remainder of the leg outside of the grain elevator structure, are not considered inside bucket elevators."
> 29 CFR 1910.272(c).

The definition of "inside bucket elevator" is important for purposes of determining whether the north and south receiving legs at Midwest were or were not "inside bucket elevators" and thus subject to the 1/8 inch grain dust rule. If more than 20% of the total leg height is inside the grain elevator structure, the Midwest north and south receiving legs would be considered "inside bucket elevators." If not, they are considered "outside bucket elevators" and not subject to the more stringent priority housekeeping regulations. A quick review of Defendant SMA's blueprints, sheet G7, section through workfloor, tells us that 23'-3" of the north and south receiving legs is *inside* the grain elevator structure. (Ex. 3, SMA Blueprint). On the other hand 221'-9" of the north and south receiving legs is *outside* the grain elevator structure. (Ex. 3, SMA Blueprint). Accordingly of the 245 foot leg, only 9.5% of the leg is *inside* the grain elevator structure. Therefore, under 29 CFR 1910.272(c), the north and south receiving legs at Alton are unequivocally considered "*outside* bucket elevators."

Because the north and south receiving legs at Alton are outside bucket elevators, the more stringent priority housekeeping rules do not apply. 29 CFR 1910.272(c)(2)(i)(A).

Midwest, however, enacted a housekeeping program that went *beyond* the requirements of 29 CFR 1910.272. (Ex. 4, Verberg, Bradley Dep. 26-27:13-1; 29:8-16; 30:22-25; 52:2-11; Ex. 5, Jungers, Chad Dep. 112-113:7-6) (testimony confirming 1/8 inch rule applied to *entire* facility pursuant to RCI training).

Despite the fact that Midwest enacted and applied a more stringent housekeeping policy than required by 29 CFR 1910.272, Mr. Kornstad has opined that Midwest violated 29 CFR 1910.272(j) in three respects. (Ex. 6, Kornstad Report p. 6). First, Mr. Kornstad claims that Midwest violated 29 CFR 1910.272(j) because he claims that (j) requires that "as dust begins to accumulate, an employee or employees should be assigned to immediately begin cleaning any accumulations." (Ex. 6, Kornstad Report p. 6). Mr. Kornstad is simply wrong and has inserted language into section (j) that does not exist. The entirety of (j) is provided to the Court above. Nowhere in the standard is the requirement that Mr. Kornstad claims was violated in this case.

Second, Mr. Kornstad claims that an alleged "accumulation of dust in a boot pit is an unsafe practice when the dust is not immediately removed as was the case at Midwest Farmers and is a clear violation of Section (j)." (Ex. 6, Kornstad Report p. 6). Again, Mr. Kornstad is simply wrong and has inserted language into section (j) that does not exist. Ironically, Mr. Kornstad fails to provide reference to any specific subsection of (j) when claiming that the standard was violated in both his first and second criticisms.

Mr. Kornstad's clear misunderstanding and misapplication of section (j) is likely due to his lack of familiarity with the standard. In fact, during his deposition, it became apparent that Mr. Kornstad had absolutely no idea what an "inside bucket elevator" was even though it is specifically defined in the standard that he relies upon for criticisms of Midwest. (Ex. 2, Kornstad Dep. 21-22:10-22; 39-40:25-12; 41:6-17; 41-42:22-19; 43:14-17; 45:11-25). Take for instance the following exchange:

> Q. Well, if you go back to the Definition section, the OSHA standard under (c), Definition, it says what an inside bucket elevator is; correct? And we've gone through that.
> A. Okay. I don't know where you're reading.
> Q. Under Definition section of the OSHA standard.
> A. Okay. Under definitions where? What specifically are you talking about?
> Q. It defines an inside bucket elevator; correct?
> A. No. I don't see that.

(Ex. 2, Kornstad Dep. 41:6-15).

As the above testimony demonstrates, Mr. Kornstad was literally clueless as to the significance of the definition of "inside bucket elevator" despite rendering opinions critical of Midwest applying the "inside bucket elevator" standard. That is not the end of Mr. Kornstad's misgivings, though. After Plaintiff's counsel made Mr. Kornstad knowledgeable on the definition section of the standard he claims to be an expert in, Mr. Kornstad went on to then misapply the definition to the undisputed facts of this case before finally reversing gears and changing his opinions. (Ex. 2, Kornstad Dep. 43-44:14-17; 45:11-25; 35:9-25; 36-38:23-3). The following exchange took place with Mr. Kornstad:

> Q. And I think you've already stated that you do not know what, if any, would be considered inside bucket elevators and what, if any, would be considered outside bucket elevators according to the OSHA standard?
> A. I'm sorry. I did not understand that.
> Q. I'll have her read it back.
> (The record was read by the court reporter.)
> A. At the Alton facility?
> Q. Yes, sir.
> A. The two receiving would definitely be inside bucket elevators. I don't know about the dryer leg or bucket elevator. I don't know how it was fed, if it was in a boot, et cetera. So I can't answer that question specifically.
> Q. What information do you have that -- strike that. I think you've already indicated that you thought that the north and south receiving legs were 200 feet in length?
> A. If my memory serves me correctly, approximately

| | |
|---|---|
| | correct. |
| Q. | What information do you have that more than 40 feet of the north and south elevators were below grade or inside an elevator structure? |
| A. | Well, from what I did read and understand, I believe that the two receiving legs went through the roof of the enclosure for the truck pits and then down into the boots. Specifically how far, I don't know. |
| Q. | Well, you said that the north and south legs were considered by you inside boot pits -- or excuse me -- inside bucket elevators. Tell me the reason why then you believe that the north and south legs were considered inside bucket elevators. |
| A. | I considered them because they're in a very deep boot pit. |
| Q. | **I'm correct that the north and south leg are not, according to OSHA, considered inside bucket elevators?** |
| **A.** | **As it is stated here, yes.** |

(Ex. 2, Kornstad Dep. 43-44:14-17; 45:11-25).

The Court cannot allow Mr. Kornstad to create language in Section (j) that simply does not exist. His opinions are unreliable because he is unfamiliar with the standard. Is his unfamiliarity due to his absence from the United States grain industry for 20 years? Perhaps. Is his unfamiliarity due to an attempt to deceive the Court and jury as to the requirements of section (j)? Perhaps. Regardless of his intent, Mr. Kornstad's opinions are unreliable, and he cannot be allowed to so testify at trial.

The third criticism levied by Mr. Kornstad of Midwest's housekeeping program is an alleged failure to "have a written housekeeping program as required by the Standard." (Ex. 6, Kornstad Report p. 6). To begin with, Midwest did have a written housekeeping program, relying on the documents and training from RCI. (Ex. 4, Verberg Dep. 52:2-11; Ex. 5, Jungers Dep. 113:3-6; Ex. 7, Devall Dep. 41:7-12). Even Mr. Kornstad admits that Midwest was provided annual training from RCI. (Ex. 2, Kornstad Dep. 22-23:23-18; 24:5-12) (*see also* Ex. 2,

Kornstad Dep. 27-28:24-8; 30-31:25-6)(stating that he has no evidence that Midwest did or did not violate the Grain Handling Standard). Regardless, the issue of whether or not the program is written or unwritten is nothing more than a red herring. The alleged failure to have a *written* program simply cannot be the cause of the explosion in this matter. *See Thompson v. Kaczinski*, 774 N.W.2d 829 (Iowa 2009). A "writing" does not clean a grain elevator. Similarly, the failure to have a program in "writing" does not clean a grain elevator.

To clarify the red herring opinion set forth by Mr. Kornstad, we can look at the opposite of his factual assertion and conclusion. Assume that Midwest had a written housekeeping program. Does that mean that housekeeping could not be the cause of the explosion because the program is in writing? No, the focus for causation is on the actual housekeeping *practices*, not whether a writing exists. Simply put, whether the program is or is not in writing has no implication on whether housekeeping practices played any role in the explosion. To allow Mr. Kornstad to speculate and raise conjecture regarding a "writing" would only serve to confuse the jury as to the real issues in this case, the actual housekeeping practices of Midwest. Accordingly, the Court must strike Mr. Kornstad's third housekeeping opinion as well.

A final criticism underlying Mr. Kornstad's opinions is his failure to read and reference the deposition testimony of Midwest employee, Richard Devall. (Ex. 2, Kornstad Dep. 11:1-4; 59-60:17-1). Mr. Devall started working at the Alton terminal in March 2008 and was assisting Tony Jungers on housekeeping at the time of the explosion. (Ex. 7, Devall Dep. 20-21:20-2). To completely ignore the testimony of the employee charged with the duty of housekeeping yet render opinions critical of housekeeping is unreliable and should not be encouraged by this Court.

    **2.**      **BEARING TEMPERATURE MONITORING**

Mr. Kornstad renders three opinions regarding bearing temperature monitoring in his report. (Ex. 6, Kornstad Report p. 2-4). First, Mr. Kornstad opines that externally mounted bearing sensors are "standard for the industry" and are "an effective way to monitor bearing temperatures." (Ex. 6, Kornstad Report p. 2-3). Second, Mr. Kornstad opines that the computer screen for the monitoring system that allowed Midwest to establish and change set points for the bearing temperature monitoring system is "a standard feature and good industry practice." (Ex. 6, Kornstad Report p. 3). Third, Mr. Kornstad opines that allegedly Midwest "operated bucket elevators for extended periods of time while the bearing temperature monitoring system was not operational" and that this is practice violates 29 CFR 1910.272(m). (Ex. 6, Kornstad Report p. 3).

As to all three criticisms levied by Mr. Kornstad, it must be noted that his opinions on industry standard are unreliable given his absence from the United States grain industry for 20 years and his lack of experience with rural cooperatives such as Midwest. When Mr. Kornstad was employed in the United States, he did have a brief stint with Rolffes Company in Boone from 1989-1992. (Ex. 1, Kornstad CV). While Mr. Kornstad's curriculum vitae indicates that Rolffes was involved in the "design and development of various monitoring devices," Mr. Kornstad confirmed in his deposition that this referred to monitoring devices for grain temperature within silos and not bearing temperature sensors. (Ex. 2, Kornstad Dep. 13-15:16-8). Simply put, Mr. Kornstad's work history and education does not make him an expert in bearing temperature sensors.

During his deposition, Mr. Kornstad confirmed his lack of understanding and knowledge regarding the opinions he was asked to express. For instance, Mr. Kornstad could not identify whether during the last 10 to 15 years there has been a strong trend to utilize internal temperature probes on bearings. (Ex. 2, Kornstad Dep. 64:5-11). In fact, he could not identify any elevator

he was aware of that had either external bearing temperature sensors or internal bearing temperature sensors. (Ex. 2, Kornstad Dep. 72:4-10). He was not aware that Defendant Dodge sold pillow block bearings designed for internal bearing sensors. (Ex. 2, Kornstad Dep. 72:12-16). Importantly, Mr. Kornstad is not aware of a single study on whether external or internal bearing sensors are more effective. (Ex. 2, Kornstad Dep. 68:10-13). On that topic, Mr. Kornstad testified as follows:

> Q. Regarding external versus internal bearing sensors, have you read any studies on what is more effective, if either one?
> A. No, I have not.

(Ex. 2, Kornstad Dep. 68:10-13; 69-70:23-3).

Mr. Kornstad confirmed that he had no experience to back up his opinions on bearing temperature sensors.

> Q. What is your experience regarding reaching opinions as to whether an external or internal bearing is better or equal?
> A. I have no opinion other than the fact that they both work.

(Ex. 2, Kornstad Dep. 63-64:23-3).

In addition to his lack of experience and education regarding bearing temperature sensors, Mr. Kornstad is again unfamiliar with the Grain Handling Standard as it applies to bearing temperature sensors. Mr. Kornstad alleges that Midwest "operated bucket elevators for extended periods of time while the bearing temperature monitoring system was not operational" and that this is practice violates 29 CFR 1910.272(m)." Mr. Kornstad, however, ignores the requirements of 29 CFR 1910.272(q). Section (q) is entitled "Inside Bucket Elevators" and contains requirements specific to inside bucket elevators. Section (q)(4)(ii) provides that "not later than April 1, 1991, the employer shall provide vibration monitoring, temperature monitoring, or other means to monitor the condition of those bearings mounted inside or

partially-inside the leg casing." 29 CFR 1910.272(q). There is not similar requirement to have temperature monitoring on "outside bucket elevators."

Presumably, Mr. Kornstad's confusion as to the requirements of the Grain Handling Standard stems from his fundamental misunderstanding of what an "inside bucket elevator" is, as discussed above. Regardless of his confusion, the fact remains that the Grain Handling Standard does not require that the receiving legs be operated with temperature monitoring. Mr. Kornstad ignores this provision and provides an unreliable opinion by expressing the opposite.

While Mr. Kornstad may be knowledgeable on how the Afghanistan or Russian grain markets operate, he simply lacks the necessary training, education, and experience to render opinions regarding bearing temperature sensors, including their use and effectiveness at small, rural grain elevators such as Midwest.

### 3. DUST CONTROL SYSTEMS AND OIL SYSTEMS

Mr. Kornstad renders two opinions regarding Midwest's practices with respect to the dust control system and oil systems. (Ex. 6, Kornstad Report p. 5-6). First, Mr. Kornstad alleges that "Midwest Farmers violated the Grain Handling Standard requirements in section (m) which sets forth that an employer must have preventative maintenance procedures in place that include regularly scheduled inspections of a dust control system and that further, an employer must promptly correct dust control systems which are malfunctioning." (Ex. 6, Kornstad Report p. 5). In contradiction to his opinion, Mr. Kornstad next states that "Tony Jungers has testified that Midwest Farmers had not encountered any problems with the dust collector system." (Ex. 6, Kornstad Report p. 5). Mr. Kornstad's opinion and the facts relied upon for his opinion are contradictory. On one hand, he asserts that the standard mandates that "[Midwest] must promptly correct dust control systems which are malfunctioning." (Ex. 6, Kornstad Report p. 5). On the other hand, he relies on Tony Jungers' testimony saying that the dust control system was

*not* malfunctioning. Simply put, his opinion does not fit the facts of this case and is completely unreliable.

Mr. Kornstad's second opinion is that "the dust collection system was not being operated by Midwest Farmers at the time of the incident in violation of the Grain Handling Standard." (Ex. 6, Kornstad Report p. 5). Mr. Kornstad fails to identify in his report which part of the Standard was violated. (Ex. 6, Kornstad Report p. 5-6). His failure to identify which part of the Standard was allegedly violated is due to the fact that no part of the Standard was violated. In fact, Mr. Kornstad confirmed as such during his deposition when he opined that use of a dust collector system was not mandatory but recommended and that an adequate dust control system would be a broom.

> Q. I'm asking you if OSHA Grain Handling Standard -- whether it requires a dust control system such as a filter or vacuum system.
> A. I do believe that it does. I'm going to have to take a moment to look. (Peruses documents.) It does recommend filter collectors.
> Q. Okay. "Recommend" is not mandatory, is it?
> A. I can't say that it's anything more than recommendation.
> Q. All right. Mr. Kornstad, would you tell me what you believe to be an adequate manual dust control system?
> A. A broom.

(Ex. 2, Kornstad Dep. 94:9-23).

Mr. Kornstad's opinions regarding the dust control systems and oil systems are unsupported by the Grain Handling Standard and the facts of this case. The Court must prohibit Mr. Kornstad from confusing and prejudicing the jury with opinions regarding the dust control systems and oil systems that are unreliable and nothing more than conjecture

   **4.    BEARING MAINTENANCE AND INSPECTION**

13
Case 5:09-cv-04002-MWB   Document 202-1   Filed 08/16/11   Page 13 of 19

Mr. Kornstad renders five opinions regarding Midwest's bearing maintenance and inspection practices. (Ex. 6, Kornstad Report p. 4-5). Before discussing each opinion rendered in his report, the Court should be aware of Mr. Kornstad's lack of knowledge of what rural elevators such as Midwest actually do regarding greasing of head pulley bearings.

> Q. Well, let me explain it. We've talked about rural elevators. And I'm just saying, what knowledge do you have regarding what rural elevators do regarding greasing of head pulley bearings?
> A. I don't -- I don't have an opinion on that.

(Ex. 2, Kornstad Dep. 92:11-17).

With that as a backdrop for Mr. Kornstad's experience and knowledge regarding lubrication, Plaintiff will address his lubrication and inspection opinions expressed in his report. First, Mr. Kornstad alleges that "[S]ection (m) of the Grain Handling Standard requires that the employer must have *written* preventative maintenance procedures that include regularly scheduled inspections of mechanical and safety control equipment associated with bucket elevators." (Ex. 6, Kornstad Report p. 4).[2] Mr. Kornstad again shows his lack of understanding of 29 CFR 1910.272 in his statement. 29 CFR 1910.272 provides in part:

> (m) Preventative maintenance.
>
> (1) The employer shall implement preventative maintenance procedures consisting of:
>
> > (i) Regularly scheduled inspection of at the mechanical and safety control equipment associated with….bucket elevators;
> >
> > (ii) Lubrication and other appropriate maintenance in accordance with manufacturers' recommendations, or as determined necessary by prior operating records.
>
> 29 CFR 1910.272(m).

---

[2] See also Mr. Kornstad's statement that "Bearing maintenance requires developing a specific *written* program and procedures that will be used by persons informed about bearing maintenance." There is no *written* requirement for preventative maintenance programs anywhere in the Standard. The same can be said regarding Mr. Kornstad's "logging" requirements. (Ex. 6, Kornstad Report p. 4-5).

Nowhere in 29 CFR 1910.272(m) is there a requirement that "an employer must have a *written* preventative maintenance procedure" as alleged by Mr. Kornstad. Mr. Kornstad should be prohibited from confusing and prejudicing the jury and Court by once again incorrectly citing the Grain Handling Standard.

Second, Mr. Kornstad opines that "Midwest Farmers did not have any regularly scheduled inspections of any of the mechanical or safety control equipment as outlined in section 1910.272(m)(i)…and [was] not regularly inspecting any of the bearings on the conveying legs." (Ex. 6, Kornstad Report p. 4). Mr. Kornstad failed to provide citations as a basis for his opinion. (Ex. 6, Kornstad Report p. 4). Perhaps his failure is due to the fact that his opinions have no basis in fact. Midwest employee Tony Jungers testified that Midwest "did inspections [of the equipment at the facility] as a matter of routine." (Ex. 5, Jungers Dep. 115:4-13; 115-116: 20-6; 116:19-23; 118:12-25; 119-20:8-1; Ex. 8, Raines Dep: 33:1-14; 57-58:13-8). Mr. Kornstad has failed to apply standards reliably to the facts of the case. Accordingly, his opinion must be struck by this Court.

Third, Mr. Kornstad opines that "[S]ection (m) of the Standard also requires that an elevator such as Midwest Farmers must lubricate the bearing in accordance with the manufacturer's recommendations or as determined necessary by operating records." (Ex. 6, Kornstad Report p. 4). Mr. Kornstad goes on to stated that "From my review of deposition testimony, Midwest Farmers did not consult the Dodge manufacturer's recommendations or consult any other written instructions, [and] did not have an adequate system in place for determining bearing maintenance." (Ex. 6, Kornstad Report p. 4). This opinion is inherently suspect coming from an expert who openly admits that he is unfamiliar with how rural grain elevators perform bearing maintenance. Setting that aside for the moment, Mr. Kornstad's

opinion is yet another misstatement of the Grain Handling Standard and of the facts of the case. Mr. Kornstad's opinion misstates he Grain Hanlding Standard to the extent it does not require a "consultation" of the manufacturer's recommendations. 29 CFR 1910.272(m)(1)(ii). Rather, the Standard sets forth that lubrication be "in accordance with manufacturers' recommendations." With respect to being "in accordance with manufacturers' recommendations," Dodge representatives have consistently testified that greasing four times per year, as was done at Alton, would be their recommendation. (Ex. 9, Volkman Dep. 45:9-12; Ex. 10, D. Nisley Dep. 75-76:16-11; Ex. 11, Burdeshaw Dep. 66-67:13-4; Ex. 5, Jungers Dep. 120:7-17). Shockingly, Mr. Kornstad was not provided and did not review the deposition testimony of Volkman, Nisley, or Burdeshaw. (Ex. 6, Kornstad Report p. 2). Perhaps even more shocking and surprising given the fact that Mr. Kornstad himself has never received or reviewed Dodge's bearing maintenance instructions. (Ex. 2, Kornstad Dep. 73:14-24). Again, Mr. Kornstad has failed to (1) state the standard correctly and (2) apply the standard reliably to the facts of the case. Accordingly, his opinion must be struck by this Court.

Fourth, Mr. Kornstad opines that "Midwest Farmers did not keep prior operating records of the bearing to evaluate and determine an appropriate lubrication schedule all in violation of the Grain Handling Standard." (Ex. 6, Kornstad Report p. 4). Mr. Kornstad's opinion changes the "or" to an "and" in the Grain Handling Standard. In other words, his opinion requires Midwest to not only lubricate in accordance with manufacturers' recommendations, but also to lubricate as determined necessary by prior operating records. 29 CFR 1910.272(m)(1)(ii) provides that these options are "either/or." This is yet another example of Mr. Kornstad's lack of familiarity with the Grain Handling Standard.

Even more shocking than his misstatement of the Standard is that Mr. Kornstad provides no citation to the record in support of his conclusion. A quick review of the record indicates that

Midwest did in fact have keep operating and maintenance records. (Ex. 8, Raines Dep. 42-44:17-16). Mr. Kornstad's report indicates that he was provided Mr. Raines' deposition, but he apparently has blatantly misstated his testimony in an attempt to fit his "theory" of lubrication practices. Such slight of hand should not be accepted by this Court. Accordingly, because Mr. Kornstad has again failed to (1) state the standard correctly and (2) apply the standard reliability to the facts of the case, his opinions must be struck by this Court.

Fifth, Mr. Kornstad opines that "Section (m) requires that the employer promptly correct or remove overheated bearings…which Midwest Farmers did not do here." Unfortunately, Mr. Kornstad once again incorrectly misstates the Standard. 29 CFR 1910.272(m)(2) provides that "the employer shall promptly correct or remove from service overheated bearings…*associated with inside bucket elevators*." As discussed at length above, the NDS SRL bearing that failed in this matter was part of an outside bucket elevator. The Standard relied upon by Mr. Kornstad simply does not apply. Because Mr. Kornstad has failed to state the standard correctly, his opinions must be struck by the Court.

### 5. INSPECTIONS, RECORDKEEPING AND OPERATIONS PRACTICES

Mr. Kornstad renders two opinions regarding Midwest's inspections, recordkeeping and operations practices. (Ex. 6, Kornstad Report p. 6-7). First, Mr. Kornstad asserts that "Midwest Farmers did not keep any certification records." (Ex. 6, Kornstad Report p. 6). Mr. Kornstad provides no citation to the record in support of his conclusion. As discussed in above, a quick review of the record indicates that Midwest did in fact have keep operating and maintenance records. (Ex. 8, Raines Dep. 42-44:17-16). While the record keeping was destroyed in the explosion and fire, Mr. Kornstad does admit that the employees could reliably testify to their practices and patterns, including their recordkeeping. (Ex. 2, Kornstad Dep. 25:14-23). Mr.

Kornstad's statement is yet another example of his failure to apply the standard reliability to the facts of the case, and his opinions must be struck by this Court.

Second, Mr. Kornstad claims that "Section (e) of the Standard requires the employer to provide training at least once a year on specific procedures and safety practices applicable to job tasks, including preventative maintenance procedures…and Midwest Farmers did not provide training as required by the Standard." (Ex. 6, Kornstad Report p. 6-7). Mr. Kornstad provides no citation to the record in support his conclusion. As discussed above, when Mr. Kornstad was pressed on this opinion during his deposition, he had to admit that there was no basis in fact as Midwest was provided annual training from RCI. (Ex. 2, Kornstad Dep. 22-23:23-18; 24:5-12) (see also Ex. 2, Kornstad Dep. 27-28:24-8; 30-31:25-6)(stating that he has no evidence that Midwest did or did not violate the Grain Handling Standard). Given the fact that Mr. Kornstad admits that his opinion does not comport with the facts of this case, it must be struck.

### III.    PRAYER FOR RELIEF

Wherefore, Plaintiff Nationwide Agribusiness Insurance Company prays that the Court enter an Order pursuant to Fed. R. Evid. 104(a) precluding George J. Kornstad from offering expert opinions entirely and specifically to the related to the topics set forth in this supporting Brief under Fed. R. Evid. 702 and the required Daubert analysis, and for such further relief as the Court deems equitable or required under the circumstances. Further, Plaintiff prays that it be heard orally on these issues.

BEATTIE LAW FIRM

By  *Donald G. Beattie*
Donald G. Beattie (AT0000736)
Brett J. Beattie (AT0008988)
Nile Hicks (AT0009391)
4300 Grand Ave.
Des Moines IA  50312
Phone:  (515) 263-1000
FAX:    (515) 263-1411
don.beattie@beattielawfirm.com
Attorneys for Plaintiff

Certificate of Service

The undersigned certifies that on  August 16     , 2011 , I electronically filed the foregoing with the Clerk of the Court using the ECF System which will send notification of such filing to the counsel below.

    /s/ Rachelle Reynolds

Mark D. Alijets, Esq.
Matthew R. Eslick, Esq.
Angel Anna West, Esq.
Nyemaster, Good, West,
Hansell & O'Brien, P.C.
700 Walnut, Suite 1600
Des Moines, Iowa 50309

Thomas Henderson, Esq.
Erik S. Fisk, Esq.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue, Ste 1200

Thompson Coburn LLP
David Dick
Tracy J. Cowan
B. Matthew Struble
One U.S. Bank Plaza
St. Louis, Missouri 63101

19
Case 5:09-cv-04002-MWB   Document 202-1   Filed 08/16/11   Page 19 of 19