**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

NATIONWIDE AGRIBUSINESS
INSURANCE COMPANY,

       Plaintiff,

vs.

SMA ELEVATOR CONSTRUCTION
INC.; SCHLAGEL, INC.; BALDOR
ELECTRIC COMPANY; BALDOR
ELECTRIC COMPANY, formerly
known as or also known as DODGE;
DODGE, also known as or now known
as BALDOR ELECTRIC COMPANY,

       Defendants.

No. C 09-4002-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . 10
   *B. Negligence/Strict Liability Claims* . . . . . . . . . . . . . . . . . . . . . 12
      *1. Immunity of SMA to product claims* . . . . . . . . . . . . . . . . . 14
      *a. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 14
      *b. Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
         *i. The applicable statute* . . . . . . . . . . . . . . . . . 16
         *ii. The pertinent "products"* . . . . . . . . . . . . . . . 20
         *iii. Was SMA an "assembler"?* . . . . . . . . . . . . . . 21
         *iv. Summary as to "product defect" claims* . . . . . . 27

     *v.*   *Remaining negligence claims against SMA* . . . . 28
  **2.**   **Warning or instruction defect claims against Baldor** . . . . . . 30
   *a.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 30
   *b.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
  **3.**   **Design defect claims against Baldor** . . . . . . . . . . . . . . . 36
   *a.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 37
   *b.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
  **4.**   **Manufacturing defect claims against Baldor and Schlagel** . . 50
   *a.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 50
   *b.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
  **5.**   **Installation defects and general negligence claims against**
     **Schlagel** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
   *a.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 54
   *b.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
**C.**   **Breach Of Implied Warranties** . . . . . . . . . . . . . . . . . . . . . . . 57
  **1.**   **Warranty of merchantability** . . . . . . . . . . . . . . . . . . . . 57
   *a.*   *Immunity of SMA* . . . . . . . . . . . . . . . . . . . . . . . 57
   *b.*   *Timeliness of the claim against Schlagel and Baldor* . . 58
    *i.*   *Arguments of the parties* . . . . . . . . . . . . . . . 59
    *ii.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 60
  **2.**   **Warranty of fitness for a particular purpose** . . . . . . . . . . . 64
   *a.*   *The claim against SMA* . . . . . . . . . . . . . . . . . . . 65
    *i.*   *Arguments of the parties* . . . . . . . . . . . . . . . 65
    *ii.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 66
   *b.*   *Timeliness of the claim against Schlagel and Baldor* . . 68
    *i.*   *Arguments of the parties* . . . . . . . . . . . . . . . 68
    *ii.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 69
  **3.**   **Warranty of workmanlike manner** . . . . . . . . . . . . . . . . . 72
   *a.*   *The claim against SMA* . . . . . . . . . . . . . . . . . . . 73
    *i.*   *Arguments of the parties* . . . . . . . . . . . . . . . 73
    *ii.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . 74
   *b.*   *The claim against Schlagel and Baldor* . . . . . . . . . . 77
**D.**   **Breach Of Express Warranties** . . . . . . . . . . . . . . . . . . . . . . . 77
  **1.**   **The claim against SMA** . . . . . . . . . . . . . . . . . . . . . . . 77
   *a.*   *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 77
   *b.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
  **2.**   **The claims against Schlagel and Baldor** . . . . . . . . . . . . . 85

       **a.**      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 85
              **i.**     *The arguments as to Schlagel* . . . . . . . . . . . . 85
              **ii.**    *The arguments as to Baldor* . . . . . . . . . . . . . 85
       **b.**      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              **i.**     *The effect of § 554.2318* . . . . . . . . . . . . . . . . 87
              **ii.**    *Schlagel's other grounds for summary judgment.* 92
              **iii.**   *Baldor's other grounds for summary judgment* . 92
  **E. Breach Of Contract** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
     **1.**     *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 95
     **2.**     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

This diversity action, involving claims of products liability, negligence, and breach of warranties, arises from an explosion and fire on or about July 9, 2008, at a grain elevator in Alton, Iowa. The plaintiff insurance company alleges that the explosion was caused by an overheated or hot pillow block bearing manufactured by one defendant, and selected, specified, and installed on an elevator leg by two others, the general contractor that built the grain elevator and the subcontractor that designed and manufactured the elevator legs that moved the grain around the elevator. Each of the defendants has moved for summary judgment on some or all of the claims against it.

# I. INTRODUCTION

## A. Factual Background

I will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, I will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' motions for summary judgment. Unless expressly indicated otherwise, the parties agree that the facts stated are undisputed.[1]

At the center of this litigation is the Midwest Farmers Cooperative grain elevator in Alton, Iowa (the Alton grain elevator), which was constructed in 1997-1998. The Alton grain elevator was equipped with multiple "legs," or "bucket elevators," each of which was essentially an enclosed conveyor that carried grain from the "pit," where farmers dump grain, to the top of the elevator leg, using cups attached to a conveyor belt. When a cup on the conveyor reached the top of the leg, the grain was dumped out and fell by gravity through a distributor, which directed the grain to one of a number of different silos. Near the top of a grain elevator leg is a "head pulley," which is the shaft, motor, drive, gearboxes, bearings, and other equipment that help to power the movement of the conveyor and also secure the top of the conveyor to the greater elevator structure. The shaft in the head pulley at issue here (on the south receiving leg of the Alton grain elevator) was secured to the structure with two Dodge brand "non-expansion" tapered anti-friction (TAF) roller pillow block bearings. In a "non-expansion" bearing, the internal

---

[1] I have not necessarily stated facts precisely as the parties have stated them in their respective statements of facts or responses to each other's statements of facts; instead, I have occasionally recast them to eliminate disputed language, to track more precisely the language of documents or deposition testimony, and for other editorial or organizational reasons. Nevertheless, I believe that I have accurately indicated what facts are undisputed and which are disputed and why.

part of the bearing cannot move with the shaft relative to the outer housing. One such bearing was on the "drive side," and the other was on the "non-drive side" of the conveyor and shaft. The Dodge TAF bearing at issue is a multi-purpose bearing that can be used for any number of purposes in any number of different industries or applications.

On the afternoon of July 9, 2008, a farmer was unloading grain at the Alton grain elevator. He dumped his grain into the "pit," and it was conveyed to the top of the grain elevator by the south leg. An explosion and fire occurred shortly after the farmer started dumping his grain. A series of other explosions and fires continued at the Alton grain elevator for a few days after July 9, 2008. The plaintiff's experts have opined that the origin of the ignition of the explosion is at and/or in the head section of the south receiving leg and that the non-drive bearing on that leg became white hot. There is some dispute about whether the overheating of the bearing was because of inadequate lubrication, exposure of the uncovered bearing to weather and contaminants, corrosion, or fatigue, and whether the explosion and fire could have been avoided by adequate dust control or hazard monitoring systems or other measures. In other words, the parties dispute whether the bearing was the cause of the initial explosion and fire or was damaged by the explosion and fire.

The parties in this action are plaintiff Nationwide Agribusiness Insurance Company (Nationwide), as the insurer for Midwest Farmers Cooperative's Alton grain elevator; defendant SMA Elevator Construction Company (SMA), which was the general contractor for the construction of the Alton grain elevator; defendant Schlagel, Inc. (Schlagel), which was the subcontractor for the grain elevator responsible for designing and manufacturing the grain handling equipment, including the elevator legs; and defendant Baldor Electric Company (Baldor), which is the successor by merger to Reliance Electric Company, and

the manufacturer and seller of the Dodge brand bearing at issue here.[2] The role of each of these defendants requires a little more discussion.

SMA was the general "design-build" contractor for the Alton grain elevator. Midwest Farmers Cooperative contracted with SMA to build the Alton grain elevator as a "turnkey operation." SMA performed the construction of the Alton grain elevator, including installation of equipment supplied by subcontractors. SMA contends that it relied on Schalgel for the design and selection of the elevator leg at issue, and installed the leg supplied by Schlagel, but Nationwide denies this, asserting that SMA acted as a designer, manufacturer, and installer of "the project." *See, e.g.,* Nationwide's Response to Defendant SMA's Statement Of Undisputed Material Facts In Support Of Motion For Summary Judgment (docket no. 161-1), ¶ 5. Nationwide asserts that "Schlagel products and services were part of the SMA design and installation and approved by SMA." *Id.* Nationwide alleges that SMA engaged in "assembly" of the leg itself to the extent that SMA placed the cups on the belts and shimmed the bearings, *see* Nationwide's Combined Statement Of Facts In Support Of Its Resistance To All Defendants' Motions For Summary Judgment (docket no. 161-2), ¶ 196, which the defendants admit, although they assert that "nearly the entire remainder of the leg came preassembled from Schlagel." *See* Defendants' Joint Objections And Responses To Plaintiff's Statements Of Additional Facts (docket no. 181-1), ¶ 196.

---

[2]Baldor is sometimes described in the parties' submissions, including those by Baldor, as "Dodge." Schlagel purchased the Dodge bearing at issue in this case from General Electric and Equipment Company (GEECO). GEECO was a defendant in this action, but it settled with Nationwide. S-M Enterprises, which designed, manufactured, and supplied the dust collector system that SMA approved and installed into the Alton grain elevator, was also previously a party to this litigation, but has also settled with Nationwide.

Schlagel, as a subcontractor for SMA, designed and manufactured certain equipment, including the elevator legs, for the Alton grain elevator and sold equipment to SMA for use in the design, construction, and installation of the elevator. Schlagel asserts that it is a manufacturer of grain storage and handling products, but does not sell directly to end users or perform any installation services. Nationwide asserts, however, that Schlagel did have direct contact with and made direct sales to Midwest Farmers Cooperative. The parties dispute what installation or operations materials were provided by Schlagel to SMA for the elevator legs for the Alton grain elevator.

As of 1997, Baldor designed and manufactured approximately 3.5 million bearings per year of different types, including the type at issue here. As of 1997 and through the present, Baldor did not sell bearings, including the type at issue here, to an "end user"; instead, Baldor sold Dodge bearings through licensed distributors (such as GEECO) that stocked and sold Dodge bearings and other products. In fact, Baldor manufactured the bearing at issue here in 1997 and sold it to GEECO. Baldor shipped bearings with an attached instruction manual, which included lubrication instructions and other information. Baldor marketed its Dodge bearings by distributing to customers a "Dodge Bearing Engineering Catalog," which listed the different types of Dodge bearings and accessory products available for the various types of bearings. In 1997 and 1998, Baldor offered a Dodge end closure (also called an "end cap" or "end cover") as an accessory for the type of bearing at issue here. Such an end cap is more or less a cover that fits over the end of a shaft and attaches to one side of a bearing to cover that side. As of 1996, Baldor also sold as a Dodge auxiliary or accessory product an extra seal known as an "E-tect seal," which is an extra rubber seal that can be added to a Dodge bearing, such as the one at issue here, to provide an additional seal and additional layer of protection from outside contaminants. The end cap and E-tect seal must be added to the bearing after installation.

The bearing at issue here had neither an end cap nor an E-tect seal as installed on the Alton grain elevator, although Nationwide contends that it would have been possible to install both on that bearing. Indeed, Nationwide asserts that the bearing, end cap, and E-tect seal should have been sold as a unit.

## B. Procedural Background

Nationwide originally filed this action, pursuant to its subrogation rights as Midwest Farmers Cooperative's insurer, on or about November 24, 2008, in the Iowa District Court for Sioux County, against defendants SMA, Schlagel, Baldor, and S-M Enterprises, Inc. *See* docket nos. 2 and 5. On January 9, 2009, Baldor removed this action to this court, based on this court's diversity jurisdiction under 28 U.S.C. § 1332(a). *See* Notice Of Removal (docket no. 2). The various defendants all eventually answered Nationwide's original state court petition or subsequent amendments. S-M Enterprises and another defendant named in a subsequent amendment, GEECO, eventually settled with Nationwide and are no longer part of this lawsuit.

The pertinent pleading at this point in the proceedings is Nationwide's Fourth Amended Complaint (docket no. 130), filed March 21, 2011. In that version of the Complaint, Nationwide alleged that it insured Midwest Farmers Cooperative to a certain extent for losses caused by the explosion or fire at the Alton grain elevator and that it has made certain payments to Midwest Farmers Cooperative and/or on behalf of Midwest Farmers Cooperative as a result of the explosion. Nationwide also alleges that Midwest Farmers Cooperative has assigned all of its claims to Nationwide to the extent that Nationwide has paid for the loss to Midwest Farmers Cooperative. Nationwide alleges that it is, therefore, the proper real party in interest. Nationwide asserts claims of negligence/strict liability, breach of implied warranty of merchantability, breach of implied

warranty of fitness for a particular purpose, breach of implied warranty of workmanlike manner, and breach of expressed warranties against each defendant, and a claim of breach of contract against SMA. Baldor filed an Answer (docket no. 131) on April 14, 2011; SMA filed an Answer (docket no. 132) on April 29, 2011; and Schlagel filed an Answer (docket no. 143) on May 11, 2011. Pursuant to a Trial Management Order (docket no. 93), filed April 20, 2010, after the filing of prior amendments to the Complaint, a jury trial was set to begin on September 26, 2011. However, that trial date had to be moved to accommodate my busy criminal trial calendar, so the trial was reset to begin on May 7, 2012, by Order (docket no. 222) filed on August 25, 2011.

On May 2, 2011, each of the defendants filed a separate Motion For Summary Judgment on some or all of the claims against it. *See* docket nos. 133, 137, 139.[3] Nationwide filed separate Resistances (docket no. 159, 160, 161) to the defendants' motions on June 8, 2011, with separate briefs and separate responses to the defendants' separate statements of fact, but a single Combined Statement Of Facts In Support Of Its Resistance To All Defendants' Motions For Summary Judgment (docket no. 161-2). On July 5, 2011, the defendants filed a Joint Objection And Responses To Plaintiff's Statements Of Additional Fact (docket no. 178). The defendants then filed separate Reply Briefs (docket nos. 176, 181, and 183) in support of their Motions For Summary Judgment on July 5 and 6, 2011.

---

[3]Also on May 2, 2011, the defendants jointly filed a Motion For Spoliation Sanctions And Request For Dismissal With Prejudice (docket no. 135), asserting that sanctions, including dismissal, are appropriate, because Nationwide allowed the scene of the grain elevator explosion and fire to be destroyed before any of the defendants had an opportunity to conduct an independent investigation. That motion is pending before Chief United States Magistrate Judge Paul A. Zoss.

The defendants all requested oral arguments on their Motions For Summary Judgment. However, my busy court schedule, including a two-week stint as a visiting judge in the District of the Northern Mariana Islands, has not allowed for such oral arguments.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-

87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U. S. 574, 586-87 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587.

*Torgerson v. City of Rochester*, ___ F.3d ___, ___, 2011 WL 2135636, at *7 (June 1, 2011) (*en banc*).

I will apply these standards to the defendants' Motions for Summary Judgment. In doing so, I will consider the kinds of claims, in turn, rather than defendant by defendant.


### B. *Negligence/Strict Liability Claims*

Nationwide has asserted what it calls "negligence/strict liability" claims against SMA (in Division I of the Fourth Amended Complaint) and Schlagel (in Division VII) and Baldor (in Division XII). It appears that the majority, but not necessarily all, of these claims are "product liability" claims. Although the precise allegations of conduct giving rise to liability for negligence or strict liability vary somewhat with the defendant against whom they are asserted, they fall into the same three categories for all three of the defendants: product warning and instruction defects, product design defects, and product manufacturing defects. Nationwide also alleges "installation defect—general negligence"

claims against SMA and Schlagel, but not Baldor. The grounds for summary judgment on these claims are best addressed topically, rather than defendant by defendant.[4]

---

[4]Although I will consider these claims on the grounds asserted, I have some question about whether tort claims are viable in the circumstances presented here. The Iowa Supreme Court considered the relationship between product defect claims and breach of warranty claims in *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159 (Iowa 2002), as follows:

> Almost twenty years ago, we observed that a warranty of merchantability "is based on a purchaser's reasonable expectation that goods . . . will be free of significant *defects* and will perform in the way goods of that kind should perform." *Van Wyk v. Norden Labs., Inc.*, 345 N.W.2d 81, 84 (Iowa 1984) (emphasis added). More recently, this court has held that proof of a "serious product defect" was sufficient to support submission of strict liability and breach of warranty theories. *Ballard v. Amana Soc'y, Inc.*, 526 N.W.2d 558, 562 (Iowa 1995). Notwithstanding a shared focus on defects, warranty claims have been distinguished from strict liability claims on the ground that "'defects of suitability and quality are redressed through contract actions and safety hazards through tort actions.'" *Am. Fire & Cas. Co. v. Ford Motor Co.*, 588 N.W.2d 437, 439 (Iowa 1999) (citations omitted); *cf. Shell*, 489 So. 2d at 571 ("The implied warranty mandated by this section of the U.C.C. is one of commercial fitness and suitability. . . . That is to say, the U.C.C. does not impose upon the seller the broader obligation to warrant against health hazards inherent in the use of the product when the warranty of commercial fitness has been complied with. Those injured by the use of or contact with such a product, under these circumstances, must find their remedy outside the warranty remedies afforded by the U.C.C."). Despite this distinction, we have found no error in submitting personal injury claims under both strict liability and breach of warranty theories. *See Mercer*, 616 N.W.2d at 621. In contrast, where only

(continued...)

### 1.    *Immunity of SMA to product claims*

#### a.    *Arguments of the parties*

Only SMA asserts that it is immune to liability or damages on Nationwide's product defect claims against it, set out in Division I of Nationwide's latest Complaint, pursuant to IOWA CODE § 613.18.  More specifically, SMA argues that it is immune to Nationwide's product defect claims, because §§ 613.18(1)(a) and (b), together, render non-assemblers, non-designers, and non-manufacturers who are wholesalers, retailers, distributors, or sellers of products "[i]mmune" from or "[n]ot liable for damages" on product manufacturing, design, and warning defect claims.   SMA argues that both parts of § 613.18(1) remain viable after the Iowa Supreme Court adopted the RESTATEMENT

---

[4](...continued)

> economic loss is alleged, recovery is limited to warranty claims.  *E.g., Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 107 (Iowa 1995) (affirming dismissal of negligence and strict liability claims in case alleging purely economic injuries).
>
>            * * *
>
> As this review of our case law reveals, we have distinguished product claims premised on tort theories from product claims grounded on warranty theories on the basis of the damages sought rather than on the basis of the nature of the wrongful conduct.   And, although we have limited cases involving only economic loss to warranty theories, personal injury plaintiffs are permitted to seek recovery under tort and warranty theories that in essence allege the same wrongful acts.

*Wright*, 652 N.W.2d at 180-81.  This excerpt from *Wright* seems to beg the question, not presented in the motions for summary judgment in this case, of whether or not Nationwide's product defect claims will lie, where there is no personal injury and only economic damages are sought.

(THIRD) OF TORTS: PRODUCTS LIABILITY (RESTATEMENT (THIRD)) §§ 1 and 2, which essentially eliminated artificial distinctions between "negligence" and "strict liability" for product defect claims. Here, SMA argues that it is undisputed that it did not manufacture, design, or assemble the specific products alleged to be defective—indeed, it was not the manufacturer at all, but a general contractor. More specifically, SMA argues that it did not manufacture, design, or assemble the bearing alleged to have overheated, because Baldor did; it did not manufacture, design, or assemble the portion of the south leg alleged to be defective, because Schlagel did; and it did not manufacture, design, or assemble the hazard monitoring system, because former defendant S & M did. SMA also argues that Nationwide has not proved that SMA manufactured, designed, or assembled the bearing, the elevator leg, or the hazard monitoring system. Furthermore, SMA argues that the § 613.18(2) "assembler" exception does not apply, because Nationwide cannot prove that SMA's assembly activities caused Nationwide's damages, and Nationwide has not even alleged that they did.

Nationwide does not dispute the continued viability of § 613.18, but does assert that § 613.18(1) provides no protection to SMA, because SMA did design and assemble the *entire* grain elevator. Nationwide argues that, in *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 826 (Iowa 2000), the Iowa Supreme Court made clear that liability would attach to assemblers incorporating defective component parts into their finished product. Here, Nationwide argues that SMA admits that the Schlagel legs, of which the bearings were a part, were a component of the grain elevator, that SMA made decisions about safety and monitoring equipment to include, and that SMA failed to advise Midwest Farmers Cooperative how to operate and maintain the grain elevator safely and properly. As an alternative—and contradictory—approach, Nationwide argues that § 613.18 does not apply, because the grain elevator was not a "product." Changing theories yet again,

Nationwide also argues that SMA's "assembly" activities (apparently in relation to the entire grain elevator) did cause Nationwide's damages, because SMA knew that its components were defective, intentionally specified defective components, and observed the defects before, during, and after it constructed the elevator. Nationwide argues that its experts have opined that the various safety defects in the elevator were the cause of the explosion or the damages from the explosion.

In reply, SMA argues that Nationwide has not alleged that the elevator was defective, only that certain parts incorporated into the elevator were defective. SMA argues that it takes a tortured reading of *Weyerhaeuser* to transfer liability of component part manufacturers to a general contractor, such as SMA. SMA argues that each of the component parts here had commercial value independent of and detached from the entire elevator. SMA also argues that *Weyerhaeuser* did not analyze § 613.18(2), but that provision would only hold assemblers liable where the assembling process—not just incorporation of a defective product in the course of assembly—has some causal connection to the alleged defect.

### b.     Analysis

*i.     The applicable statute.* The statute on which SMA's immunity argument relies provides, in pertinent part, as follows:

> **613.18.  Limitation on products liability of non-manufacturers**
>
> 1. A person who is *not* the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:
>
> a. *Immune from any suit* based upon strict liability in tort or breach of implied warranty of merchantability *which arises*

*solely from an alleged defect in the original design or manufacture of the product.*

b. *Not liable for damages* based upon strict liability in tort or breach of implied warranty of merchantability *for the product* upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.

2. *A person who is a retailer of a product and who assembles a product, such assembly having no causal relationship to the injury from which the claim arises, is not liable for damages* based upon strict liability in tort or breach of implied warranty of merchantability *which arises from an alleged defect in the original design or manufacture of the product* upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.

IOWA CODE § 613.18(1)-(2) (emphasis added).

As the Iowa Supreme Court observed almost two decades ago, "the statute is not a model of clarity." *Bingham v. Marshall & Huschart Machinery Co., Inc.*, 485 N.W.2d 78, 80 (Iowa 1992). Nevertheless, as the Iowa Supreme Court has also explained,

The statute is divided into two subsections. Subsection 613.18(1) pertains to wholesalers, retailers, distributors and other sellers who are not the manufacturer or designer of the product and who do not assemble the product. Subsection 613.18(2) pertains to retailers who do assemble the products they sell.

Subsection 613.18(1) is itself divided into two paragraphs. Paragraph 613.18(1)(a) provides for immunity from suit when the potential claim arises solely from defects in the original design or manufacture of the product. Paragraph 613.18(1)(b) limits strict liability and implied warranty claims when the claims do not arise solely from an alleged defect in the original design or manufacture of the product. Examples

17

> of suits arising under paragraph 613.18(1)(b) include suits under strict liability for failure to warn about the dangers of a product. *See, e.g., Cooley v. Quick Supply* Co., 221 N.W.2d 763, 768-69 (Iowa 1974) (citing Restatement § 402A); *LaCoste v. Ford Motor Co.*, 322 N.W.2d 898, 900 (Iowa App.1982); *Prosser & Keeton on Torts* § 99, at 695 (5th ed. 1984); 63 Am.Jur.2d *Products Liability* § 545 (1984).

*Bingham*, 485 N.W.2d at 80.

If the defendant sold, but did not assemble, the product, subsection 613.18(1) may be applicable, but "subsection 613.18(2) is inapplicable." *Id.* If the defendant did not assemble (or design or manufacture) the product, and the claim arises "solely from an alleged defect in the original design or manufacture of the product," then subsection 613.18(1)(a) is applicable, and provides the wholesaler, retailer, distributor, or seller with immunity; and if the defendant did not assemble (or manufacture or design) the product, subsection 613.18(1)(b) "limits strict liability and implied warranty claims when the claims do not arise solely from an alleged defect in the original design or manufacture of the products," such as "suits under strict liability for failure to warn about the dangers of a product." *Id.* The immunity provided by subsection 613.18(1)(a) is not dependent upon proof that the manufacturer of the product is subject to the jurisdiction of the courts of this state and has not been declared judicially insolvent, as is required in subsections 613.18(1)(b) and (2). *Id.* On the other hand, subsection 613.18(2) is applicable if the defendant *did* assemble the product, but it bars liability for damages if the assembly had "no causal relationship to the injury from which the claim arises." IOWA CODE § 613.18(2); *Bingham*, 485 N.W.2d at 80.

The statutory protection from product defect claims in IOWA CODE § 613.18(1)(a) expressly applies only to claims "which arise[] solely from an alleged defect in the original design or manufacture of the products," and the protection from product defect claims in

IOWA CODE § 613.18(1)(b) applies to other claims "for the product," which the Iowa Supreme Court has explained includes "failure to warn" claims. *Bingham*, 485 N.W.2d at 80. "Installation defect" claims do not appear to be precluded by § 613.18(1). Any statutory protection from "installation defect" claims, thus, must come from IOWA CODE § 613.18(2). Indeed, it appears that the possibility of liability for "assemblers" under IOWA CODE § 613.18(2) specifically acknowledges the possibility of liability for "defective installation," at least where the statute contains no specific definition of "assembly" or "assembler" that would exclude "installation" or "installer." *Weyerhaeuser Co. v. Thermogas Co.*, 620 N.W.2d 819, 824 (Iowa 2000) (noting that the statute contains no definition of "assemble," and concluding "the dictionary meanings of 'assemble' and 'assembler' contemplate a person or thing that brings together [two or more] things); *and compare* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 606 (10th ed. 1995) (defining "install," in the pertinent sense, as "to set up for use or service"), *with id.* at 68 (also defining "assemble" as "to fit together the parts of"). SMA's statutory protection from certain "product defect" claims pursuant to § 613.18(2), where SMA allegedly "assembled," *i.e.*, "installed," the products applies only if "such assembly ha[d] no causal relationship to the injury from which the claim arises." IOWA CODE § 613.18(2).

There are at least two preliminary questions that control the applicability of any portion of § 613.18 here. The first question is, what is a "product"? This question is relevant, because all of the provisions of § 613.18 at issue here relate to a "product." *See* IOWA CODE § 613.18(1) and (2). Furthermore, the parties here dispute whether the "products" in question are some or all of the following: the entire grain elevator, the elevator leg, the hazard monitoring system, or the bearing. The second question is, who is an "assembler"? This question is relevant here, because whether or not a party is an "assembler" is determinative of what subsection of § 613.18 is applicable. *See Bingham*,

485 N.W.2d at 80 (subsection 613.18(1) may apply if the party was not the manufacturer, designer, or assembler, and subsection 613.18(2) may apply if the party was an assembler).

      *ii.*    **The pertinent "products."**  In *Kolarik v. Cory International Corp.*, 721 N.W.2d 159 (Iowa 2006), the Iowa Supreme Court considered the meaning of "product" in IOWA CODE § 613.18. The Iowa Supreme Court relied on the following legal dictionary definition of "product":  "'Something that is distributed commercially for use or consumption and that is usually (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption.'" *Kolarik*, 721 N.W.2d at 163 (quoting BLACK'S LAW DICTIONARY 1225 (7th ed. 1999)). The court then opined that the statute "is aimed at situations giving rise to product liability actions," which it found included actions based on food products and other agricultural products. *Id.*

      Neither a grain elevator, elevator leg, hazard monitoring system, or bearing is an agricultural or food product, but that is not the extent of possible "products" within the meaning of the statute. What is determinative here is that the Alton grain elevator clearly does not fit the definition applied by the Iowa Supreme Court in *Kolarik*, because a grain elevator is not distributed commercially for use or consumption, is not tangible personal property, and has not passed through a chain of commercial distribution before ultimate use or consumption. The Alton grain elevator is a building erected upon and affixed to real property—*i.e.*, it *is* "real property." *See, e.g.,* BLACK'S LAW DICTIONARY 1218 (6th ed. 1990) (defining "real property" as "Land, and generally whatever is erected or growing upon or affixed to land"). In contrast, an elevator leg, a hazard monitoring system, and a bearing not only meet these requirements but also are the result of fabrication or processing. *See Kolarik*, 721 N.W.2d at 163. Thus, § 613.18 applies, if

at all, only to SMA's conduct as to the elevator leg, hazard monitoring system, and the bearing, but not on its conduct as to the grain elevator in its entirety.

Perhaps just as importantly, none of Nationwide's product liability claims can be asserted against SMA on the basis that the Alton grain elevator in its entirety is the pertinent "product." As the Iowa Supreme Court noted in *Kolarik*, § 613.18 "is aimed at situations giving rise to product liability actions." *Kolarik*, 721 N.W.2d at 163. Thus, if something does not meet the definition of "product" within the meaning of § 613.18, then it also is not a "product" that would give rise to a products liability action. *Cf. id.* Nationwide has not cited any Iowa product liability case in which the purported "product" was a grain elevator that was real property, like the Alton grain elevator, and I have found none. Unlike the Alton grain elevator, the "grain elevators" at issue in the product liability cases of *Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911 (Iowa 1990), and *Flattery v. Goode*, 38 N.W.2d 668 (Iowa 1949), were mobile pieces of equipment—*i.e.*, "tangible personal property," resulting from fabrication or processing, distributed commercially for use or consumption, that passed through a chain of commercial distribution before ultimate use or consumption. *See Kolarik*, 721 N.W.2d at 163 (defining "product" (citing Black's Law Dictionary 1225 (7th ed. 1999)); *see also Anderson v. Glynn Constr. Co., Inc.*, 421 N.W.2d 141 (Iowa 1988) (personal injury case by a grain elevator employee, based on injury from a grain augur in the elevator, not on the elevator in its entirety). Thus, the only "products" that are relevant to Nationwide's product liability claims are the elevator leg, the hazard monitoring system, and the bearing.

*iii.* **Was SMA an "assembler"?** The next question is whether or not SMA was an "assembler"—or, for that matter, a "manufacturer" or "designer"—of the elevator leg, the hazard monitoring system, or the bearing, which is determinative of whether subsection (1) or (2) of § 613.18 is or might be applicable here. As the Iowa Supreme Court has

noted, § 613.18 does not define "assembler." *Weyerhaeuser Co.*, 620 N.W.2d at 824. As the court explained,

> We therefore resort to its common and ordinary meaning. *See Gerst v. Marshall,* 549 N.W.2d 810, 814 (Iowa 1996).
>
> The verb "assemble" means "to bring together or gather together into one place, company, body, or whole." Webster's Encyclopedic Unabridged Dictionary 125 (rev. ed. 1996). "Assembler" is defined as "a person or thing that assembles." *Id.* Thus, the dictionary meanings of "assemble" and "assembler" contemplate a person or thing that brings together [two or more] things into a whole.
>
> The dictionary definition of "assembler" closely resembles the definition of "assembler" in a torts liability setting.

*Weyerhaeuser Co.*, 620 N.W.2d at 824. As I suggested above, nothing in these definitions of "assembly" and "assembler" would exclude an "installation" or "installer."

In *Weyerhaeuser*, the Iowa Supreme Court explained that an assembler can be held liable for failure of a component that it did not manufacture. *Id.* at 825. Here, Nationwide asserts that SMA's "assembly" of the leg involved placing the cups on the belts and shimming the bearings, and SMA admits that it put the cups on the belts and shimmed the bearings. *See* Nationwide's Combined Statement Of Facts In Support Of Its Resistance To All Defendants' Motions For Summary Judgment (docket no. 161-2), ¶ 196; Defendants' Joint Objections And Responses To Plaintiff's Statements Of Additional Facts (docket no. 181-1), ¶ 196. While I would not so find, taking the facts in the light most favorable to Nationwide, the non-moving party, *see Torgerson*, ___ F.3d at ___, 2011 WL 2135636, at *7, I believe that a reasonable juror could find that SMA "assembled" the elevator leg, because SMA did bring together two or more things (such as cups and belts) into a whole (an elevator leg). *Weyerhaeuser Co.*, 620 N.W.2d at 824. Thus, if SMA is

an "assembler" of the elevator leg, the immunity and non-liability provisions of § 613.18(1) are not applicable to SMA as to defects in the elevator leg. *See* IOWA CODE § 613.18(1) (providing for immunity or non-liability of a party that is *not* an "assembler"); *Bingham*, 485 N.W.2d at 80 (subsection 613.18(1) only applies if the party was not the manufacturer, designer, or assembler). Of course, if a jury find that SMA is not an "assembler" of the elevator leg, then SMA will be entitled to the immunity and non-liability protections of § 613.18(1).[5]

_____

[5]I do not find any genuine issues of material fact as to whether SMA "manufactured" or "designed" the elevator leg. Like the Iowa Supreme Court in *Weyerhaeuser*, when it sought a definition of "assemble," I must rely on dictionary definitions of "manufacture" and "design," because the statute provides no definitions of those terms. *Weyerhaeuser*, 620 N.W.2d 824. To "manufacture," in senses relevant here, means "to make into a product suitable for use," "to make from raw materials by hand or by machinery," or to "invent, fabricate." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 709 (10th ed. 1995). To "design," in the senses relevant here, means "to create, fashion, execute, or construct according to plan: devise, contrive," "to conceive and plan out in the mind," or "to devise for a specific function or end." *Id.* at 313. Simply giving Schlagel the particular specifications for height, capacity, usage rate, and other factors, which Schlagel then used to design, assemble, and construct a leg that was peculiar to that application, *see* Nationwide's Combined Statement Of Facts In Support Of Its Resistance To All Defendants' Motions For Summary Judgment (docket no. 161-2), ¶ 217, does not generate any genuine issues of material fact that SMA "manufactured" or "designed" the elevator leg. Such conduct is simply providing the information any purchaser would provide to get a product designed to meet its requirements, not fabricating the necessary apparatus from raw materials or conceiving or devising the necessary apparatus to fulfill the function. *See also* Defendants' Joint Objections And Responses To Plaintiff's Statements Of Additional Facts (docket no. 181-1), ¶ 217 (asserting that SMA only provided Schlagel with the capacities, the type of material that the elevator was going to be conveying or moving, and the hours of operation, but Schlagel designed the elevator leg to meet those requirements). Thus, I need only consider whether or not SMA was an "assembler." Genuine issues of material fact that SMA "assembled" the elevator leg are

(continued...)

The determination that there are genuine issues of material fact as to whether or not SMA was an "assembler" of the elevator leg does not end the inquiry as to SMA's potential immunity or non-liability for defect claims related to the elevator leg, however. Rather, I must also consider whether SMA can raise the non-liability protection of § 613.18(2), even if it was an "assembler" of the elevator leg. *See Bingham*, 485 N.W.2d at 80 (explaining that "[s]ubsection 613.18(2) pertains to retailers who do assemble the products they sell"). Although Nationwide alleges that SMA "assembled" the elevator leg by placing the cups on the conveyor and shimming the bearing, nowhere in either its Fourth Amended Complaint or its responses to the defendants' statements of fact or its own statement of additional facts has Nationwide alleged that these aspects of SMA's "assembly" of the elevator leg had a "causal relationship to the injury from which the claim arises." Iowa Code § 613.18(2). Furthermore, the manufacturer of the elevator leg, Schlagel, is not only subject to the jurisdiction of the courts of this state, but is a party to this litigation, and has not been judicially declared insolvent. *Id.* Thus, even if SMA was an "assembler" of the elevator leg, there is no genuine issue of material fact barring summary judgment on SMA's non-liability for product defect claims as to the elevator leg.

The Iowa Supreme Court's decision in *Weyerhaeuser*, on which Nationwide relies, is not to the contrary. As Nationwide argues, the Iowa Supreme Court did conclude in *Weyerhaeuser*, in its analysis of § 613.18(1), that the theory of assembler liability applies to an assembler who incorporates a defective component part into its finished product, even if the assembler did not manufacture the component part. *See Weyerhaeuser Co.*, 620 N.W.2d at 824. Even so, the decision in *Weyerhaeuser* nowhere considered the effect of

---

[5](...continued)

sufficient to deny SMA's motion for summary judgment on the basis of the protections provided by § 613.18(1).

§ 613.18(2). SMA is correct that Nationwide's reading of *Weyerhaeuser* as stripping it of immunity or non-liability protection, if it was an assembler, would nullify § 613.18(2). I cannot conclude that the Iowa Supreme Court intended any such result in *Weyerhaeuser*, where the court did not even discuss the effect of § 613.18(2).

Thus, notwithstanding genuine issues of material fact as to whether or not SMA was an "assembler" or "installer" of the elevator leg, SMA is entitled to immunity or non-liability for product defect claims relating to the elevator leg. If SMA *was not* an "assembler" of the elevator leg, it is entitled, as a matter of law, to the immunity and non-liability protection of § 613.18(1) to defect claims relating to the elevator leg, but if SMA *was* an "assembler," it is entitled, as a matter of law, to the non-liability protection of § 613.18(2) as to claims of defects relating to the elevator leg. Thus, SMA is entitled to summary judgment on Nationwide's product defect claims relating to the elevator leg pursuant to § 613.18.

The analysis is somewhat different as to whether or not SMA has statutory protection from Nationwide's manufacturing, design, and warning defect claims as to the bearing and the hazard warning system. Nationwide offers no facts from which a reasonable jury could find that SMA assembled (or designed or manufactured) the bearing or the hazard warning system. For purposes of § 613.18(1)(a), SMA is entitled to immunity to any claims which arise solely from an alleged defect in the original design or manufacture of the bearing or the hazard warning system. For purposes of § 613.18(1)(b), where there is no dispute that Baldor, the manufacturer of the bearing, and S-M, the manufacturer of the hazard warning system, are not only subject to the jurisdiction of the courts of this state, but are or were parties to this litigation, and neither has been judicially declared insolvent, SMA is entitled to non-liability for damages on warning defect claims relating to the bearing and the hazard warning system. Thus, SMA is entitled to statutory

protection pursuant to § 613.18(1) from product defect claims relating to the bearing and the hazard warning system and is, therefore, entitled to summary judgment on Nationwide's product defect claims as to the bearing and the hazard warning system.

The "installation defect" claims against SMA, relating to any of the "products" at issue—the elevator leg, the bearing, or the hazard monitoring system—also require separate consideration. As noted above, statutory protection, if any, from "installation defect" claims must come from IOWA CODE § 613.18(2), where the general definition of "assembler" under the statute appears to encompass "installation." SMA's statutory protection from certain "product defect" claims pursuant to § 613.18(2), where SMA allegedly "assembled," *i.e.*, "installed," the products applies only if "such assembly ha[d] no causal relationship to the injury from which the claim arises." IOWA CODE § 613.18(2). Here, I find no claims of "installation defects" that *did* allegedly have a causal relationship to the injury from which Nationwide's claims arise, because the only claim that appears to be an "installation defect" claim is actually, as a matter of law, a "design defect" claim masquerading as an "installation defect" claim. As such, it cannot evade SMA's statutory protection from "design defect" claims.

Specifically, Nationwide claims in ¶ 17(4)(a) of the Fourth Amended Complaint that SMA "fail[ed] to install the head pulley bearing correctly, including, but not limited to, the failure to install a non-expansion and expansion pillow block bearing on the head section of the south leg." I have found no specification in the current record or briefing of how SMA incorrectly installed the head pulley bearing *other than* in the alleged failure to install a non-expansion and expansion pillow block bearing on the head section of the south leg, but that allegation is simply that SMA installed the leg *as it had been designed by Schlagel*. *Cf. See, e.g., Khoury v. Philips Medical Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) (the plaintiff did not state an installation defect claim when the allegedly negligent

installer installed a wrongly designed installation precisely correctly). The record does not generate any genuine issues of material fact that SMA's installation of the leg involved selection of the bearings to be used in the installation, where the bearings were part of the leg, or that SMA failed to follow instructions for proper installation. *Compare Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000) (sustaining a claim of negligent installation, where the installer failed to follow instructions to install an attic radiation shield around the chimney flue and to keep insulation away from light fixtures and flues). Thus, SMA is entitled to summary judgment on Nationwide's only claim alleging an "installation defect," because SMA is entitled to summary judgment on the basis of the statutory protections provided by § 613.18 on what is, in reality, a "design defect" claim.

     *iv.* ***Summary as to "product defect" claims***. In short, Nationwide's product defect claims will not lie against SMA as they relate to the grain elevator as a whole, because the grain elevator is not a "product" within the meaning of either § 613.18 specifically or Iowa products liability law generally. SMA was not an "assembler" (or manufacturer or designer) of the bearing or the hazard warning system, so that, as a matter of law, SMA is entitled to the immunity and non-liability protections of § 613.18(1) as to defect claims relating to the bearing and the hazard warning system. SMA is also entitled to immunity or non-liability for product defect claims relating to the elevator leg. If SMA *was not* an "assembler" of the elevator leg, it is entitled, as a matter of law, to the immunity and non-liability protection of § 613.18(1) to defect claims relating to the elevator leg, but if SMA *was* an "assembler," it is entitled, as a matter of law, to the non-liability protection of § 613.18(2) as to claims of defects relating to the elevator leg. Thus, SMA is entitled to summary judgment on Nationwide's product defect claims relating to the elevator leg pursuant to § 613.18. SMA is also entitled to summary judgment on the

only claim cognizable as an "installation defect" claim, because that claim is really a "design defect" claim, from which SMA has statutory protection, masquerading as an "installation defect" claim.

I need not and will not consider any of SMA's other grounds for summary judgment on Nationwide's design, manufacture, warning, or installation product defect claims in Division I of the Fourth Amended Complaint.

*v.* ***Remaining negligence claims against SMA***. The conclusions just above do *not* mean that SMA is entitled to summary judgment on *all* of the claims in Division I, however. I note that, in addition to claims that are plainly "product defect" claims, Nationwide also asserts in Division I of the Fourth Amended Complaint various claims, including those expressly denominated "general negligence" claims, that are not necessarily "product defect" claims. *Cf. Estate of Pearson ex rel. Latta v. Interstate Power and Light Co.*, 700 N.W.2d 333, 341 n.1 (Iowa 2005) (finding that the court did not need to decide the applicability of RESTATEMENT (THIRD) § 2, "because the parties tried the case as a negligence case, rather than as a defective product case"). Indeed, while the parties seem to have addressed the claims in Division I as if they were all "product defect" claims under strict liability and/or negligence theories, at least for purposes of summary judgment briefing, Division I does not expressly limit the claims therein in that way. Instead, Division I alleges more generally "[t]hat Defendant, SMA, was negligent and/or strictly liable in one or more of the following particulars." Fourth Amended Complaint, ¶ 17. SMA and Nationwide have not addressed any "negligence" claims beyond "product defect" claims. I find that numerous general "negligence" claims have been alleged, but I find nothing in SMA's Motion For Summary Judgment that addresses these "general negligence" claims, which are not based on product defects. *See* Brief In Support Of Defendant [SMA's] Motion For Summary Judgment (docket no.

137-4), § III.B.4 (arguing that summary judgment is proper on Nationwide's negligence-based product defect claim).

Specifically, while I read claims alleging negligence "[i]n designing the elevator" in ways that relate specifically to the elevator leg, the hazard monitoring system, or the bearings, which are "products," as alleging "product defect" claims, and SMA has statutory protection from any such "product defect" claims, I do not read claims alleging negligence in other respects that relate to the design of the elevator *as a whole* as "product defect" claims, whatever their designation in the Fourth Amended Complaint. The claims in Division I that I find can fairly be read to assert general "negligence" claims, rather than "defective product" claims—and that, as such, survive summary judgment—are the following: "failing to use reasonable care in designing the elevator," *see* Fourth Amended Complaint, ¶ 17(2)(g); "designing the elevator such that it did not include a distributor and/or gates that would prevent the propagation of fire and/or pressure waves," *see id.* at ¶ 17(2)(n); negligence "[i]n manufacturing a grain elevator with a manufacturing defect," *see id.* at ¶ 17(3)(c), although this claim is too vague to state *any* claim; negligence "[i]n violating NFPA 61," which is the National Fire Protection Association Standard For The Prevention Of Fires And Dust Explosions In Agricultural And Food Processing Facilities, *see id.* at ¶ 17(4)(b); negligence "[i]n the selection of the hazard monitoring subcontractor," *see id.* at ¶ 17(4)(c); negligence "[i]n failing to commission the hazard monitoring system," *see id.* at ¶ 17(4)(d); and negligence "[i]n failing to provide the Dodge maintenance manual to the end user," *see id.* at ¶ 17(4)(e). Therefore, SMA is not entitled to summary judgment on these portions of Nationwide's claims in Division I.

### 2. *Warning or instruction defect claims against Baldor*

I turn, next, to Nationwide's product liability claims based on warning or instruction defects. Although Nationwide asserted such claims against all three defendants, I determined, above, that SMA has statutory protection from such claims, and Schlagel does not seek summary judgment in its favor on these claims in its Motion For Partial Summary Judgment (docket no. 139). Thus, I need only consider Baldor's motion for summary judgment on the merits of the warning or instruction defect claims against it.

#### a. *Arguments of the parties*

Baldor contends that, in *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 289-90 (Iowa 1994), the Iowa Supreme Court expressly rejected strict liability failure-to-warn claims, so that such claims may be asserted, if at all, only as negligence claims. Baldor argues that its duty to warn Midwest Farmers Cooperative was very limited under Iowa law, because Schlagel was a "sophisticated" intermediary user of bearings, Schlagel was responsible for designing and manufacturing the grain elevator leg at issue, in which Baldor's Dodge brand bearings were incorporated, and Schlagel decided what type of bearings to order. Baldor also argues that it provided Schlagel with information and instructions regarding Dodge bearings, but that Baldor was not consulted for or involved in the construction of the Alton grain elevator. Baldor also contends that it provided Schlagel with information about the existence and benefits of optional items, such as hazard monitoring systems, E-tect seals, and end caps. Indeed, Baldor contends that it cannot know the particular applications of the millions of bearings that it manufactures. In essence, Baldor contends that it fulfilled its duty to warn by warning an intermediary, Schlagel.

Baldor also argues that any failure to warn on its part was not a proximate cause of the incident at issue, because Midwest Farmers Cooperative's personnel admit that they

never read the Dodge bearing instruction manual and claimed never to have received it and never communicated with Baldor regarding the bearing; Baldor provided Schlagel with information regarding the use of expansion and non-expansion bearings and sold both kinds, but Schlagel made the decision to use two non-expansion bearings on the leg in question and did not pass along information about expansion and non-expansion bearings to SMA or others; Baldor provided a catalog to Schlagel that included information about hazard monitoring systems and bearings pre-drilled for internal sensing equipment, E-tect seals, and end caps, but Schlagel made the decisions about whether or not to use any such components; and there is no evidence that internal sensing equipment, an E-tect seal, or an end cap would have prevented or affected the incident at issue. Finally, Baldor argues that Nationwide's vague "catch all" allegations of inadequate warnings are insufficient bases for any claim.

Nationwide counters that Iowa's adoption of the RESTATEMENT (THIRD) renders invalid the "sophisticated intermediary" defense, which was premised on RESTATEMENT (SECOND) OF TORTS § 338, comment *n*. Nationwide argues that, if the defense is still viable, the Iowa Supreme Court has only recognized it in the context of prescription drugs and medical devices. Moreover, Nationwide argues that, if the defense is viable, the question of "reasonableness" on which the defense depends is for the jury to decide. Nationwide argues that a reasonable jury could reject such a defense in this case, if it is otherwise viable, because Baldor had repeated contact with Midwest Farmers Cooperative, Baldor knew that Schlagel was not properly warning end users, Baldor knew that Schlagel was not knowledgeable about bearings, and Baldor gave inadequate warnings and instructions in the first place. In other words, Nationwide argues that the disputed facts are sufficient to present a jury question on whether Baldor acted in a manner reasonably

calculated to assure that the necessary information would be passed to Midwest Farmers Cooperative or that Midwest Farmers Cooperative's safety would otherwise be addressed.

Somewhat more specifically, Nationwide argues that a jury could find from the record that Baldor knew that Schlagel was using the bearings for elevating legs in grain elevators; that the risk of a grain dust explosion in a grain elevator posed by an overheated bearing was grave; that Baldor could relatively easily have warned Midwest Farmers Cooperative directly; and that Baldor did not use due care to ascertain whether it could reasonably rely on Schlagel to warn its customers. Nationwide also argues that the "bulk supplier" doctrine also is inapplicable here. Finally, Nationwide argues that Baldor's instructions were inadequate, even if they had been passed on by Schlagel, and the inadequacy of the warnings was a proximate cause of the explosion.

### b. *Analysis*

Baldor is correct that the Iowa Supreme Court has repeatedly held that "[f]ailure to warn claims cannot be brought under a theory of strict liability." *Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 504 (Iowa 2009) (citing *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 289 (Iowa 1994)). The Iowa Supreme Court has also reiterated, "In *Wright [v. Brooke Group, Ltd.*, 652 N.W.2d 159 (Iowa 2002)], we adopted the Restatement (Third) of Torts: Products Liability sections 1 and 2 (1998)," which, in turn, "recognizes that 'strict liability is appropriate in manufacturing defect cases, but negligence principles are more suitable for other defective product cases.'" *Id.* at 504 (quoting *Wright*, 652 N.W.2d at 168). Still more specifically, "[t]he standards for . . . failure to warn claims—as recognized by the Third Products Restatement and *Wright*—require consideration of reasonableness and therefore incorporate negligence principles." *Id.* at 506 (citing RESTATEMENT (THIRD) § 2(c), at 14). Thus, failure-to-warn product defect claims are negligence claims under Iowa law, as defined in RESTATEMENT (THIRD) § 2(c).

That section of the RESTATEMENT (THIRD) defines a warning defect claim, in pertinent part, as follows:

### § 2.   Categories of Product Defect

A product is defective when, at the time of sale or distribution, it . . . is defective because of inadequate instructions or warnings.  A product:

*  *  *

(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

RESTATEMENT (THIRD) § 2(c).[6]

---

[6]The current version of Iowa Civil Jury Instruction No. 1000.3 (2010) formulates the elements of a product liability failure-to-warn claim, in light of *Wright* and RESTATEMENT (THIRD) § 2(c), as follows:

In order to recover on a claim that defendant's product was defective because of inadequate instructions or warnings, the plaintiff must prove all of the following propositions:

1.      Defendant sold or distributed the (product);

2.      The defendant was engaged in the business of selling or distributing the (product);

3.      The foreseeable risks of harm posed by the (product) could have been reduced or avoided by the provision of reasonable instructions or warnings, in one or more of the following ways:

(continued…)

33

As Baldor contends, I find that the "intermediary" defense is still viable under Iowa law. Specifically, I find that RESTATEMENT (THIRD) § 2(c) and comment *i* recognize a defense to a warning defect claim based on the duty of an intermediary—and not even necessarily a "learned" or "sophisticated" intermediary—to warn the end user. Section 2 expressly considers whether "the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by

------

[6](…continued)
       (Set out particulars as supported by the evidence).

       4.     The omission of the instruction(s) or warning(s) renders the (product) not reasonably safe;

       5.     The risk to be addressed by the instruction(s) or warning(s) was not obvious to, or generally known by, foreseeable product users;

       6.     The omission of the instruction(s) or warning(s) was a proximate cause of plaintiff's damages; and

       7.     The amount of damages.

       If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, the plaintiff is entitled to damages in some amount. [If an affirmative defense is submitted, delete the second sentence and insert the following: If the plaintiff has proved all of these propositions, then you will consider the defense of _____ as explained in Instruction No. ___.]

I find that this formulation of the elements of a warning defect claim is consistent with the formulation of the claim in *Wright* and RESTATEMENT (THIRD) § 2(c).

the seller or other distributor, *or a predecessor in the commercial chain of distribution.*"
RESTATEMENT (THIRD) § 2(c) (emphasis added). Still more specifically, comment *i* provides as follows:

> Depending on the circumstances, Subsection (c) may require that instructions and warnings be given not only to purchasers, users, and consumers, but also to others who a reasonable seller should know will be in a position to reduce or avoid the risk of harm. *There is no general rule as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly or may rely on the intermediary to relay warnings. The standard is one of reasonableness in the circumstances.* Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user. Thus, when the purchaser of machinery is the owner of a workplace who provides the machinery to employees for their use, and there is reason to doubt that the employer will pass warnings on to employees, the seller is required to reach the employees directly with necessary instructions and warnings if doing so is reasonably feasible.

RESTATEMENT (THIRD) § 2(c), comment *i* (emphasis added). The apparently wholesale adoption of § 2 in *Wright*, as reiterated in *Scott*, leads me to believe that the "intermediary" defense in comment *i* was also adopted wholesale. Contrary to Nationwide's contentions, I find nothing in *Wright* to limit the availability of the defense, recognized in the RESTATEMENT, to the context of prescription drugs and medical devices.

I do conclude, however, that, taking the facts in the light most favorable to Nationwide, the non-moving party, *see Torgerson*, ___ F.3d at ___, 2011 WL 2135636, at *7, a reasonable juror could find all of the elements of Nationwide's failure-to-warn claim against Baldor and could reject application of an "intermediary" defense. For

example, Baldor's assertion that Nationwide cannot establish the "causation" element of its claim fails in light of record evidence marshaled by Nationwide generating reasonable inferences that adequate warnings about the need for and availability of warning equipment, end caps, and E-tect seals and proper information about the choice of expansion or non-expansion bearings and lubrication of the bearings could have prevented or affected the incident in question. Similarly, I conclude that a reasonable jury could find that Baldor could not reasonably have relied upon warnings and instructions from Schlagel, the purported intermediary, in light of record evidence marshaled by Nationwide. Inferences against the reasonableness of Baldor's reliance on Schlagel to give adequate warnings arise from evidence of the gravity of the risks of a grain elevator explosion or fire posed by improperly mounted, lubricated, non-expansion, or uncovered bearings; the lack of expertise of Schlagel on such matters; the unlikelihood that Schlagel had in the past or would in the future convey the information available from Baldor to the ultimate user; and the feasibility and effectiveness of Baldor giving a warning directly to Midwest Farmers Cooperative. *See* RESTATEMENT (THIRD) § 2, comment *i* (listing factors relevant to the determination of whether it was reasonable for a product supplier to rely on an intermediary to convey adequate warnings to an end user).

Therefore, Baldor's motion for summary judgment on the failure-to-warn claims will be denied.

### 3. *Design defect claims against Baldor*

Again, Nationwide has asserted product design defect claims against all three defendants, but I determined, above, that SMA has statutory protection from such claims, and Schlagel does not seek summary judgment on such claims. Thus, once again, I need only consider Baldor's motion for summary judgment on the merits of these claims against it.

### a.     *Arguments of the parties*

Baldor argues that Nationwide has no evidence to support a design defect claim against it.  Baldor contends that, in *Wright*, the Iowa Supreme Court rejected either "negligence" or "strict liability" theories of design defect claims, allowing only a risk/utility analysis of such claims.  Baldor argues that, using this analysis, Nationwide must have expert testimony in support of this claim, but all of Nationwide's proffered bearing experts have admitted that they have no criticism of the design of the bearing; that Nationwide can offer no evidence of an alternative design for the bearing at issue; and that Nationwide cannot even produce any evidence to establish that the bearing itself (as opposed to the receiving leg of which it was made a part) was not reasonably safe as designed.  Baldor develops these arguments further.

First, Baldor asserts that expert testimony is necessary to establish a design defect unless the feasibility of a reasonable alternative design is obvious and understandable to laypersons.  Here, Baldor asserts, there is no doubt that Nationwide's alleged design theories regarding various aspects of a bearing involve technical and engineering issues that require expert testimony, but all of Nationwide's experts have testified that they have no criticism of the design of the bearing.

Second, Baldor asserts that Nationwide must prove that a reasonable alternative design was available and that the alternative design would have prevented or reduced the harm to the injured party.  Here, however, Baldor asserts that Nationwide has offered no proof of any alternative design for the bearing, much less evidence that any alternative design would have prevented the incident.

Third, Baldor contends that Nationwide has no evidence that the bearing was defective when it left Baldor's control.  Baldor points out that none of Nationwide's experts has criticized the design of the bearing's sealing system, and it was physically

impossible to manufacture a bearing with a cover over it, as a cover would prevent the bearing from fitting on a shaft, and Baldor sold end caps as an item that could be added to a bearing after it was installed. Baldor also argues that, while Nationwide asserts that the bearing design was defective because it was not pre-drilled for internal sensing equipment, there is no evidence that a bearing without "pre-drilling" is defectively designed; Baldor sold bearings with internal sensing equipment, but Schlagel chose not to use such bearings; and there is no evidence that internal (as opposed to external) sensing equipment that S-M actually installed would have prevented the incident. No alarms were activated, Baldor contends, because the external system was not activated before the incident, not because the bearing was not pre-drilled for an internal sensor. Finally, Baldor argues that the lack of some optional features that Baldor sold, but that were not installed on the elevator leg, does not demonstrate defective design by Baldor. Baldor concludes that, if Nationwide wishes to pursue a claim that a Dodge "end cap" should have been added or that Schlagel should have ordered a Dodge bearing with internal temperature sensing capabilities, then Nationwide should direct that claim elsewhere, not at Baldor.

In response, Nationwide argues that its defective design claims arise from at least five design flaws: (1) lack of E-tect seals; (2) lack of end caps; (3) lack of corrosion-proof coatings; (4) lack of bearings pre-drilled with internal bearing temperature sensors; and (5) use of a non-expansion bearing in lieu of an expansion bearing. Nationwide acknowledges that Dodge actually offered E-tect seals, end caps, corrosion-proof coatings, and pre-drilled bearings at the time that the Alton grain elevator was built, but contends that this simply demonstrates that the feasibility of these alternatives cannot be honestly contested. Nationwide also argues that Baldor admits that E-tect seals and end caps are reasonable alternative designs.

Nationwide argues that Baldor sells a large portion of its bearings to the grain industry, but sells them with seals (R-seals) that it knows are dramatically inferior to the E-tect seals for dust and water environments. Nationwide argues that Baldor was reckless in selling E-tect seals and end caps as separate add-ons buried in its catalog, so that Baldor had to help buyers select appropriate additions. Nationwide argues that a jury could find that there was no reasonable excuse for Baldor not to include E-tect seals and end-caps in its design for bearings that it targeted for sale into the grain industry, particularly for one of its best accounts, Schlagel. Nationwide acknowledges that the E-tect seal is not a replacement for the existing R-seal on the bearings in question, but fits over the R-seal to protect it, and the end caps then fit over the E-tect seal. Nationwide also acknowledges that its experts do not criticize the R-seal alone. Nevertheless, Nationwide argues that its experts do criticize the failure to include the E-tect seal and end caps into the design of a bearing destined for use in an elevator leg. Nationwide also argues that the bearings could have been coated to reduce the chances of corrosion. While such coating may double the cost of the bearing, Nationwide argues that such an alternative is still reasonable in light of the risks of overheating and dust explosions. Nationwide also argues that internal temperature sensors are not only feasible, but more effective than external sensors. Finally, Nationwide argues that a vibration hazard monitoring system was a reasonable alternative design, but that vibration monitoring and internal temperature monitoring, together, constitute a reasonable alternative to external temperature monitoring alone.

In reply, Baldor reiterates its contention that Nationwide's design defect claims are not based on a claim that the bearing actually used was defectively designed, but on the contention that Schlagel should have purchased and installed options or accessories that could have been added to that bearing or that Schlagel could have used a different type of bearing altogether. Baldor asserts that these arguments do not support a design defect

claim against it.   Baldor asserts that courts have repeatedly held that where a purchaser/entity, such as Schlagel, elects not to purchase a manufacturer's equipment or options that it knows about, and a third party claims an injury as a result of the absence of that additional option, the manufacturer cannot be held liable for a design defect. Baldor also points out that Nationwide has not pleaded a design defect claim against Baldor for selling non-expansion bearings in lieu of expansion bearings, but even if Nationwide had, such a claim would fail, because Baldor did sell expansion bearings at the time, but Schalgel chose not to use them, so that this claim should also be directed at Schlagel, not Baldor.

### b.    Analysis

"Under a design-defect claim, a plaintiff is essentially arguing that, even though the product meets the manufacturer's design specifications, the specifications themselves create unreasonable risks." *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 543 (Iowa 2006).   As the Iowa Supreme Court recently explained,

> Prior to this court's recent decision in *Wright v. Brooke Group Ltd.,* 652 N.W.2d 159 (Iowa 2002), design defect claims could be brought under a theory of either strict liability or negligence.   *See, e.g., Chown v. USM Corp.,* 297 N.W.2d 218, 220 (Iowa 1980); *Hawkeye-Security Ins. Co. v. Ford Motor Co.,* 174 N.W.2d 672, 682-84 (Iowa 1970).   In *Wright,* we adopted the Restatement (Third) of Torts:   Products Liability sections 1 and 2 (1998) [hereinafter Third Products Restatement].   *Wright,* 652 N.W.2d at 169.   The Third Products Restatement recognizes that "strict liability is appropriate in manufacturing defect cases, but negligence principles are more suitable for other defective product cases." *Id.* at 168.   Therefore, *Wright* adopted a standard of risk-utility analysis, which incorporates a consideration of reasonableness, for design defect claims, but chose to "label a claim based on

a defective product design as a design defect claim without reference to strict liability or negligence." *Id.* at 169.

*Scott v. Dutton-Lainson Co.*, 774 N.W.2d 501, 504 (Iowa 2009) (footnote omitted).

Section 2(b) of the RESTATEMENT (THIRD) defines a design defect claim, in pertinent part, as follows:

### § 2.    Categories of Product Defect

A product is defective when, at the time of sale or distribution, it . . . is defective in design. . . .  A product:

\* \* \*

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe[.]

RESTATEMENT (THIRD) § 2(b); *Scott*, 774 N.W.2d at 504 n.1 (defining design defect by quoting RESTATEMENT (THIRD) § 2(b)).  Thus, "[t]o succeed under [RESTATEMENT (THIRD)] section 2(b), a plaintiff must ordinarily show the existence of a reasonable alternative design, *Wright*, 652 N.W.2d at 169, and that this design would, at a reasonable cost, have reduced the foreseeability of harm posed by the product[,] Restatement § 2 cmt. d." *Parish*, 719 N.W.2d at 543; *accord Scott*, 774 N.W.2d at 506 ("The Third Products Restatement section 2, as adopted in *Wright*, requires plaintiffs in design defect cases to demonstrate the existence of a reasonable alternative design.").[7]

---

[7]Iowa Civil Jury Instruction No. 1000.2 states the elements of a design defect claim, in light of *Wright* and RESTATEMENT (THIRD) § 2(b), as follows:

In order to recover on the claim that defendant's product was

(continued...)

(…continued)
defective in design, the plaintiff must prove all of the following propositions:

1.      The defendant sold or distributed the (product);

2.      The defendant was engaged in the business of selling or distributing the (product);

3.      The product was in a defective condition at the time it left defendant's control, in one or more of the following ways: (Set out particulars as supported by the evidence.)

4.      A reasonable alternative safer design could have been practically adopted at the time of sale or distribution;

5.      The alternative design would have reduced or avoided the foreseeable risks of harm posed by the (product);

6.      The omission of the alternative design renders the (product) not reasonably safe;

7.      The alternative design would have reduced or prevented the plaintiff's harm;

8.      The design defect was a proximate cause of plaintiff's damage; and

9.      The amount of damage.

If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, the plaintiff is entitled to damages in some amount. [If an affirmative defense is submitted, delete

(continued…)

I find that Nationwide's design defect claims against Baldor are fatally flawed, because they blur the distinction between different "products," the Dodge TAF bearing designed and manufactured by Baldor, on the one hand, and the elevator leg designed and manufactured by Schlagel, which incorporated the Dodge bearing, on the other. As I explained above, both the bearing and the elevator leg are "products" within the meaning of Iowa tort law.

There is no genuine issue of material fact that the Dodge TAF *bearing* is a multi-purpose one that can be used for any number of purposes in any number of different industries or applications. More specifically, as Baldor argues, none of Nationwide's experts has opined that the bearing, itself, was defective. *See* Baldor's Appendix at 104 (Basta Deposition at 31:21-24) (admitting that Basta was not offering any opinions that he had a design criticism of the Dodge bearing at issue); *id.* at 110 (Bessette Deposition at 61:9-15) (admitting that he was not offering an opinion criticizing Dodge for the design of the bearing at issue and averring that he had no opinions criticizing the design of the bearing); *id.* at 254-56 (Hanke Deposition at 105:25-106:4; 170:22-25) (admitting that he had no criticism of the design of the Dodge TAF bearing at issue and was not offering any criticisms of any aspect of the design of that bearing); *id.* at 268 (Sibley Deposition at

---

[7](…continued)

> the second sentence and insert the following: If the plaintiff
> has proved all of these propositions, then you will consider the
> defense of _____ as explained in
> Instruction No. ____.]

I find that this formulation of the elements of a design defect claim is consistent with the formulation of the claim in *Wright* and RESTATEMENT (THIRD) § 2(b).

61:4-10) (admitting that he had no criticism of the design of the seal on the Dodge TAF bearing or the TAF bearing involved in the case).

Nevertheless, Nationwide argues that design of the bearing was defective, because it failed to include the E-tect seal, end caps, and, presumably, also failed to include a corrosion resistant coating, pre-drilling for internal sensors, and "expansion" rather than "non-expansion" form. Indeed, Nationwide contends that its "experts have clearly opined that it was a dereliction of design principles to not include the E-tect seal and end caps on the product." Nationwide's Brief In Support Of Its Resistance To Baldor/Dodge's Motion For Summary Judgment (docket no. 159-2), at 11. This argument fails, as a matter of law, as against Baldor, because the expert opinions cited by Nationwide do not support it and it does not distinguish between the bearing and the elevator leg, which incorporated a *bearing assembly* that was not designed by Baldor, but for which Baldor offered the allegedly missing options.

Specifically, Nationwide cites the following from the report of its expert, Jim Maness:

> One of the items addressed by bearing manufacturers is the need to protect the bearing from the environmental conditions that can be the source of contaminants (grain dust and water) getting into bearings and causing failure. This is addressed by some in the industry by placing a shroud that is made as a separate cover that is attached to the top head cover of the leg for outside legs pulley to protect the bearings from rain and snow. When used it is important to keep the area between the bearing and the head cover dust seal clean of expelled grease and grain or dust accumulations. *The Dodge catalog offers an option for bearings subject to moisture and particle (dust) contamination, a new "E-Tect" bearing seal kit [which(?)] should be a mandatory part of the bearings intended for use in*

*the grain industry on bucket elevators since standard seals do
not adequately protect against the contamination problem.*

Nationwide's Appendix at 14 (Maness's report at 9) (emphasis added).  Although Maness
states that the E-tect seal kit "should be a mandatory part of *the bearings* intended for use
in the grain industry on bucket elevators," *id.* (emphasis added), it is only by a semantic
sleight of tongue that a "separate" cover or a "seal kit" that is sold as an "option"—items
that Nationwide does not dispute are sold separately from the bearing itself—become "part
of the bearings."  Moreover, Maness's opinion that these items should be a "mandatory
part of the bearings" *for certain applications*—specifically, "use in the grain industry on
bucket elevators"—gives rise to reasonable inferences only about *the proper design of a
bucket elevator*, not about the design of the bearings themselves.

Nationwide also cites Basta's opinion that "the 'E-Tect' pillow block bearing seal
and optional end cap components *available to the Midwest Farmers' Alton Terminal's
elevator and elevator leg design/construction companies at the time of the facility's
construction* would have provided increased protection against the noted bearing grease
contamination via external moisture sources and grain dust, as well as other sources of
external bearing grease contamination."  Nationwide's Joint Appendix (docket no. 161)
at 82 (Basta's Expert Report at 12, conclusion (5)) (emphasis indicating language omitted
from Nationwide's quotation in its Brief at 12).  This opinion simply *is not* an opinion that
the bearing, itself, was defective because it was designed without an E-tect seal or end cap.
The only reasonable inference from this opinion is that *the design of the elevator leg* was
defective without such "optional" or "available" protection for the bearing.

Nationwide also cites the opinion of its expert metallurgist, Larry Hanke, that "[t]he
bearing assemblies for the head pulley shaft were inadequately sealed to prevent moisture
ingress into the bearings."  Nationwide's Joint Appendix at 207 (Hanke's Expert Report

at 3).  Again, Hanke's opinion simply *is not* an opinion that the bearing, itself, was defective, because it lacked additional protection against moisture, but an opinion that "the bearing assemblies" were defective, because they were not properly sealed.  Again, the only reasonable inference from this opinion is that *the design of the bearing assemblies in the elevator leg* was defective without adequate moisture seals for the bearing.

Finally, Nationwide asserts that Sibley opined that an E-Tect seal would have been preferred over the R-seal, but cites in support of this contention only Sibley's affidavit incorporating his November 1, 2010, report, not any specific provision of that report. Even assuming that Sibley would or did state the opinion attributed to him, that opinion, again, is that *the addition of an E-tect seal* would have been preferred over use of the R-seal *alone*, which again gives rise only to a reasonable inference that *the design of the elevator leg* was defective *without adequate additional moisture seals for the bearing*, where there is no dispute that the E-tect seal does not *replace* the R-seal, but is an optional, additional seal that can be used over a bearing with the R-seal, when circumstances warrant.

In the alternative, even if the pertinent product were *the bearing assembly*, not just the *bearing*, Baldor still would not be liable for defective design of the *bearing assembly*, as a matter of law.  In *Scallan v. Duriron Co., Inc.*, 11 F.3d 1249 (5th Cir. 1994), the Fifth Circuit Court of Appeals rejected a plaintiff's design defect claim against a pump manufacturer based on the argument that a pump with an automatic annunciator, rather than a sight glass detection system, was a safer, feasible alternative.  The court first noted that the elements of a design defect claim under then-existing Louisiana law were the following:   "(1) the danger-in-fact of the machine outweighs the utility of the product; (2) alternative, less dangerous products were available; or (3) there was a feasible, safer, alternative design for the product."   *Scallan*, 11 F.3d at 1252 (quoting *Halphen v.*

*Johns-Manville Sales Corp.*, 484 So.2d 110, 115 (La. 1986)). I do not find a meaningful distinction between this "risk/utility" test and the "risk/utility" test recognized under Iowa law and the RESTATEMENT (THIRD) § 2(b). *Compare Parish*, 719 N.W.2d at 543; *Scott*, 774 N.W.2d at 506; Iowa Civil Jury Instruction No. 1000.2.

In *Scallan*, the court rejected the plaintiff's argument that the pump manufacturer could be liable for a design defect based on failure to use an automatic annunciator, rather than a sight glass detection system, on the pump, as follows:

> As evidence that the automatic annunciator is safer than the manual sight glass, Scallan points to the testimony of Mr. Bloch, Scallan's pump expert, who testified that although either the manual or automatic system would be acceptable, he prefers the automatic annunciator because it decreases the risk of operator negligence and human error. The district court rejected Scallan's claim that the pump was defectively designed due to its lack of an automatic annunciator because Allied had knowingly selected the manual monitoring system.
> *The district court properly focused on the critical fact that Duriron offered an automatic annunciator as an option on the P/D II pump. The record is uncontradicted that Allied elected to purchase the pump with the manual sight glass instead.* Allied had full knowledge of its processes and procedures for handling the chlorine in its plant. According to Richard Schwab, an Allied supervisor, Allied did not divulge all these facts to Duriron. To determine whether the pump would meet its needs, Allied engineers made a detailed study of the specifications and actually visited the Duriron facility for performance testing of the P/D II pump. Upon Allied's request, adjustments were made to the pump after the performance tests were completed. The only inference permissible from the summary judgment evidence is that Allied made an informed decision to purchase the pump with the sight glass rather than the annunciator. The question therefore remains whether Duriron has potential liability under a design

defect theory for failing to furnish an arguably safer warning device when the purchaser rejected Duriron's offer to provide the device.

*Scallan*, 11 F.3d at 1253 (emphasis added).

The court then rejected the plaintiff's argument that a manufacturer cannot avoid liability for an unreasonably designed product by shifting responsibility for the product's design to the purchaser or another party, because in the case cited by the plaintiff, the manufacturer "did not present an option to the purchaser to furnish the [product] with [the safer alternative design]." *Id.* In the case before it, the Fifth Circuit Court of Appeals was "persuaded that [the manufacturer] fulfilled its duty to provide the arguably safer product by offering the annunciator to Duriron." *Id.* The court noted, further, that it was unable to find authority from any jurisdiction that would support the plaintiff's argument "that a manufacturer is liable for the failure to incorporate a safety device that the purchaser knowingly rejects." *Id.*; *see also Austin v. Clark Equip. Co.*, 48 F.3d 833, 837 (4th Cir. 1995) (rejecting the notion that a manufacturer was required to manufacture or design an accident proof product or to force a buyer to purchase the product with the utmost safety features, and could not be liable where the purchaser made the decision not to purchase optional safety devices available from the manufacturer).

*Scallan* is instructive here. The "critical fact" here is that Baldor offered the precise options that Nationwide now contends would have made the bearing assembly safer, and it is uncontradicted that Schlagel did not purchase those options for its elevator leg. *Cf. id.* ("The district court properly focused on the critical fact that Duriron offered an automatic annunciator as an option on the P/D II pump. The record is uncontradicted that Allied elected to purchase the pump with the manual sight glass instead."). I am persuaded that Baldor fulfilled its duty to provide the arguably safer product by offering the end cap,

E-tect seal, pre-drilled bearings, coated bearings, and "expansion" bearings as options. *See id.* Nationwide has not cited, and I have not found, authority for the proposition that a manufacturer is liable for failure to incorporate into the "design" of a multi-purpose product certain safety devices that it provides as separate, optional products, for particular uses, but a purchaser rejects. *Cf. id.* Indeed, RESTATEMENT (THIRD) § 2(b) contemplates that a product may be defectively designed because "the seller or other distributor, or a predecessor in the commercial chain of distribution" failed to reduce or avoid the harm posed by the product by failing to adopt a reasonable alternative design. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b). Thus, even where a design defect claim will not lie against the original manufacturer/designer of a product, such a claim may still lie against a party in the commercial chain of distribution who incorporates that product into another product, but in doing so fails to adopt a reasonable alternative design that avoids the harm that the original product might pose in the particular use at issue. Here, in light of Nationwide's experts' statements that they were not criticizing the design of the bearing, the defect at issue must be the failure of another party in the chain of distribution to include "options" for protecting the bearing *in the elevator leg*, a failure for which Baldor is not liable. *Cf. Scallan*, 11 F.3d at 1253.

Although the court in *Scallan* rejected design defect liability for the manufacturer where an intermediary or end user *knowingly* rejected options available from the manufacturer, *see id.,* Nationwide has not generated a genuine issue of material fact that Schlagel, a designer of elevator legs, did not know of available options to protect bearings in such an application. Instead, Nationwide's response is that Baldor sold the additional options "recklessly" by burying the options in a complex catalog and failing to make Schlagel—and others who would use the bearing in question in a grain elevator—aware of available and appropriate additional products to protect the bearing in certain uses. This

49

is not a design defect claim as to the bearing or even as to the bearing assembly, however; it is, if anything, a warning and instruction defect claim concerning inadequacies of instructions about available and appropriate options for protection of the bearing in certain circumstances. I denied Baldor's motion for summary judgment on warning defect claims, above.

Baldor is entitled to summary judgment on Nationwide's design defect claims against it.

### 4. *Manufacturing defect claims against Baldor and Schlagel*

Nationwide has asserted product manufacturing defect claims against all three defendants. I determined, above, that SMA has statutory protection from such claims. Therefore, I will consider Baldor's and Schlagel's motions for summary judgment on the manufacturing defect claims against them.

### a. *Arguments of the parties*

Baldor and Schlagel both argue, succinctly, that Nationwide has no evidence that either the bearing or the elevator leg at issue deviated from the intended design, as required to sustain a manufacturing defect claim. Baldor adds that Nationwide also has no evidence that any deviation from the design of the bearing caused the incident at issue. I can find no response by Nationwide to Baldor's motion for summary judgment on the manufacturing defect claim. Nationwide's response to Schlagel's motion for summary judgment on the manufacturing defect claims is also succinct: Nationwide contends that it has demonstrated a manufacturing defect with respect to Schlagel's failure to follow Baldor's design directions to install an expansion bearing upon the shaft. It also appears that the "manufacturing" defect by Schlagel at issue is actually an "installation" defect, the failure to use an expansion bearing, which Nationwide asserts the law simply dresses as a product defect claim, citing RESTATEMENT (SECOND) OF TORTS § 404. In its reply,

Baldor points out Nationwide's failure to respond to this portion of its summary judgment motion. Similarly, in its reply, Schlagel points out that Nationwide still has cited no evidence that the manufacturing of Schlagel's product deviated from its intended product design.

### b.    Analysis

As the Iowa Supreme Court has explained, unlike design defect and warning defect claims, to which negligence principles are applicable, "[t]he Third Products Restatement recognizes that 'strict liability is appropriate in manufacturing defect cases.'" *Scott*, 774 N.W.2d at 504 (quoting *Wright*, 652 N.W.2d at 168). The court recognized, however, that "[c]omment *c* of the Third Products Restatement section 2 notes that '[a]lthough Subsection (a) calls for liability without fault [in manufacturing defect claims], a plaintiff may seek to recover based upon allegations and proof of negligent manufacture.'" *Id.* at 505 n.3 (citing RESTATEMENT (THIRD) OF TORTS:  PRODUCTS LIABILITY § 2, cmt. *c*, at 18, and cmt. *n*, at 36).

As to a strict liability manufacturing defect claim, the RESTATEMENT (THIRD) § 2(a) provides as follows:

> ### § 2.    Categories of Product Defect
>
> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect. . . .   A product:
>
> (a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product. . . .

RESTATEMENT (THIRD) § 2(b); *Scott*, 774 N.W.2d at 504. The Iowa Supreme Court has explained that "[t]his definition is consistent with strict liability because fault is assessed

regardless of the exercise of all possible care." *Scott*, 774 N.W.2d at 504 (citing *Wright,* 652 N.W.2d at 168, for the proposition that strict liability is appropriate in manufacturing defect cases). "Clearly, . . . under Iowa law, a plaintiff may not recover from a [product] manufacturer under a manufacturing defect theory when the [product] [used] by the plaintiff [was] in the condition intended by the manufacturer." *Wright*, 652 N.W.2d at 178.[8]

---

[8]Iowa Civil Jury Instruction No. 1000.1 states the elements of a manufacturing defect claim, in light of *Wright* and RESTATEMENT (THIRD) § 2(a), as follows:

> In order to recover on a claim that defendant's product contains a manufacturing defect, the plaintiff must prove all of the following propositions:
>
> 1. The defendant sold or distributed the (product);
>
> 2. The defendant was engaged in the business of selling or distributing the (product);
>
> 3. The (product) at the time it left defendant's control contained a manufacturing defect that departed from its intended design, in one or more of the following ways: (Set out particulars as supported by the evidence);
>
> 4. The manufacturing defect was a proximate cause of plaintiff's damages; and
>
> 5. The amount of damages.
>
> If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, the plaintiff is entitled to damages in some amount. [If an affirmative defense is submitted, delete

(continued...)

As the RESTATEMENT (THIRD) explains, in comment *n* to § 2, the strict liability rule set forth in subsection (a) does not require risk-utility assessment, but a negligence claim does. RESTATEMENT (THIRD) § 2(a) cmt. *n*. However, "[w]hat must be shown under either [a negligence or strict liability] theory is that the product in question did, in fact, have a manufacturing defect at the time of sale that contributed to causing the plaintiff's harm." *Id.* Thus, if the bearing or elevator leg did not have a manufacturing defect at the time of sale, then Nationwide's manufacturing defect claim would fail under either a negligence or a strict liability theory.

Baldor and Schlagel are correct that Nationwide has utterly failed to generate any genuine issue of material fact that, at the time of sale, either the bearing or the elevator leg was *not* in the condition intended by the manufacturer. RESTATEMENT (THIRD) § 2(a); *Wright*, 652 N.W.2d at 178. Nationwide has not even attempted to do so as to the manufacturing defect claim against Baldor, and Nationwide's belated attempt to repackage its "manufacturing defect" claim against Schlagel as a negligent installation claim simply begs the question of whether that installation claim can survive summary judgment, a matter that I will consider in the next section. Nationwide's failure to generate a genuine issue of material fact as to whether either the bearing or the elevator leg was defective at the time of sale means that Baldor and Schlagel are entitled to summary judgment on

---

[8](...continued)
> the second sentence and insert the following: If the plaintiff has proved all of these propositions, then you will consider the defense of _____ as explained in Instruction No. ____.]

I find that this formulation of the elements of a design defect claim is consistent with the formulation of the claim in *Wright* and RESTATEMENT (THIRD) § 2(a).

Nationwide's manufacturing defect claims against them, under either a negligence or strict liability theory, if, indeed, Nationwide was attempting to assert such a claim on a negligence theory as well as a strict liability theory.

### 5. *Installation defects and general negligence claims against Schlagel*

Nationwide alleges "installation defect—general negligence" claims against SMA and Schlagel, but not against Baldor. These claims against SMA were addressed, above, in Section II.B.b. The disposition of Schlagel's motion for summary judgment on these claims requires separate consideration.

### a. *Arguments of the parties*

Schlagel argues that Nationwide's "installation defect" claims fail, because Schlagel owed no duty as an installer or repairer. Schlagel argues that the duty of reasonable care on a claim of negligent installation is confined to installers and repairers, but does not reach a party that manufactured a component part. Indeed, Schlagel contends, there are no Iowa decisions in which an installation defect claim has been brought against a products manufacturer for allegedly failing to install correctly specific pieces on the component part. Thus, Schlagel contends that Nationwide is simply trying to reassert a negligence-based design defect claim in the guise of an installation defect claim. Schlagel argues that the record shows that it played no role in the installation of the product in which its component parts were used, nor did it play a role in post-installation inspection.

In its response, Nationwide first identifies its "manufacturing defect" claim against Schlagel as, for example, an "installation defect" claim. Nationwide explains its "manufacturing defect" claim is that Schlagel deviated from Baldor's design by placing two non-expansion bearings on the shaft. Nationwide then argues that its manufacturing claim against Schlagel is a negligent installation claim, for all practical purposes, which the law simply dresses as a product defect claim, citing RESTATEMENT (SECOND) OF TORTS

§ 404. Thus, Nationwide argues, it is making a negligent installation claim that merely arises under the legal definition of a manufacturing defect. Nationwide does not argue, however, that the claims it has actually denominated "installation defect—general negligence" claims against Schlagel are somehow viable.

In its reply, Schlagel argues that Nationwide does not appear to contest that it failed to demonstrate that Schlagel was an installer or repairer. Thus, Schlagel contends that it is entitled to judgment as a matter of law on Nationwide's claim for installation defects.

### b.     Analysis

I find that nearly all of Nationwide's purported "installation defect" claims against Schlagel are, in fact, simply repackaged "design defect" and "manufacturing defect" claims. Indeed, the difference is usually just substituting "install" for "design" or "manufacture." While it is not necessarily impermissible to allege an alternative theory of recovery for the same allegedly wrongful conduct, there must be a legal and factual basis for the alternative theory.

Nationwide relies on RESTATEMENT (SECOND) OF TORTS § 404 for the required legal basis for its "installation defect" claims. That section provides as follows:

> ### § 404.  Negligence in Making, Rebuilding, or Repairing Chattel
>
> One who as an independent contractor negligently makes, rebuilds, or repairs a chattel for another is subject to the same liability as imposed upon negligent manufacturers of chattels.

RESTATEMENT (SECOND) OF TORTS § 404. The Iowa Supreme Court has explained a § 404 claim, briefly, as follows:

> Section 404 of the Restatement involves claims against an independent contractor who negligently rebuilds or repairs a chattel. Where, as here, the contractor has not acted to

> increase the chattel's dangerous propensities, comment *b* of
> section 404 invokes the same rationale of "deceptive
> appearance of safety" that has been recognized in the
> application of section 403.

*Anderson v. Glynn Constr. Co., Inc.*, 421 N.W.2d 141, 143-44 (Iowa 1988) (discussing a § 404 claim). Such a claim may be cognizable for "assembly," rather than just "rebuilding" or "repairing." *See Goebel v. Dean & Assocs.*, 91 F. Supp. 2d 1268, 1278 (N.D. Iowa 2000) (concluding that § 404 is applicable to an independent contractor who "assembles," rather than strictly-speaking "rebuilds" or "repairs" a chattel); *see also supra*, page 19 (concluding that "assembly" under Iowa product liability law does not exclude "installation"). In *Goebel*, I defined the duty of reasonable care imposed by § 404 to be to use reasonable care and competence to ensure that the chattel in question was in the safe condition in which a competent contractor would have put it, and that a deceptive appearance of safety breaches this duty. *Goebel*, 91 F. Supp. 2d at 1279-80.

Schlagel's contention is that it was neither a "repairer" nor an "installer" subject to any such duty, because it played no role in the installation of the product in which its component parts were used and played no role in post-installation inspection. Nationwide has not identified any record evidence giving rise to genuine issues of material fact that Schlagel "installed" *the elevator*, or even that Schlagel "installed" *the elevator leg* into the elevator. The undisputed evidence is that Schlagel delivered a fully assembled or almost fully assembled elevator leg to SMA, which SMA then installed in the elevator. Thus, Schlagel was not an independent contractor who made, rebuilt, repaired, or installed a chattel for another, *but the original designer and manufacturer of the leg*. *See* RESTATEMENT (SECOND) OF CONTRACTS § 404; *Anderson*, 421 N.W.2d at 143-44; *Goebel*, 91 F. Supp. 2d at 1278. Thus, § 404 is not applicable to Schlagel. Similarly, even to the extent that Nationwide's "installation defect" claims go to Schlagel's

installation of components into the elevator leg, Schlagel was not the independent contractor who assembled a chattel for another, but the original designer, manufacturer, and assembler of the chattel. I find that, as a matter of law, § 404 is inapplicable to Nationwide's claims against Schlagel.[9]

Thus, I hold that Schlagel is entitled to summary judgment on all of the claims in ¶ 59(4) of the Fourth Amended Complaint.

### C. Breach Of Implied Warranties

In addition to "product defect" claims, Nationwide asserts various "breach of warranty" claims. I will address these claims to the extent that they are put at issue in the defendants' motions for summary judgment.

### 1. Warranty of merchantability

Nationwide asserts claims of breach of the implied warranty of merchantability against SMA (Division II), Schlagel (Division VIII), and Baldor (Division XIII). All three defendants challenge these claims, in their motions for summary judgment, but not all on the same grounds.

### a. Immunity of SMA

Only SMA asserts that it has statutory protection from Nationwide's claims of breach of the implied warranty of merchantability pursuant to Iowa Code § 613.18.

---

[9]Unlike the situation with SMA, I do not find any "general negligence" claims in Division VII, ¶ 59(4) of the Fourth Amended Complaint (docket no. 130) that are not *product defect* claims, at least if "the elevator" in the subsections of this section is read to mean "the elevator legs" rather than the elevator as a whole, which is a logical reading, because there is no genuine issue of material fact that Schlagel did not design, manufacture, or install the entire elevator; SMA did.

SMA's statutory protection from claims of breach of the implied warranty of merchantability is co-extensive with its statutory protection from product defect claims. *See* IOWA CODE § 613.18. Thus, SMA is entitled to summary judgment on Nationwide's claim against it for breach of the implied warranty of merchantability pursuant to § 613.18 for essentially the same reasons that I found that SMA had statutory protection from various product defect claims, beginning on page 16. I will not consider SMA's other grounds for summary judgment on this claim.

### b.      Timeliness of the claim against Schlagel and Baldor

Only Schlagel has challenged Nationwide's claim of breach of implied warranty of merchantability on the ground that the claim is untimely pursuant to IOWA CODE § 554.2725(2), which provides, generally, that the statute of limitations for a breach of warranty claim begins to run upon delivery of the goods, regardless of the aggrieved party's lack of knowledge of the breach. Although Baldor did not move for summary judgment on this ground, I find that Schlagel's statute of limitations argument would be equally applicable to Baldor.

First, the implied warranty claims against both of these defendants arise from the sale of "goods." In *Speight v. Walters Dev. Co., Ltd.*, 744 N.W.2d 108 (Iowa 2008), the Iowa Supreme Court explained, "Goods are 'all things . . . which are movable at the time of identification to the contract for sale.'" 744 N.W.2d at 116 (quoting IOWA CODE § 554.2105(1)). It is clear that the elevator legs made by Schlagel and the bearings made by Baldor were "goods," as both were "'movable at the time of identification to the contract for sale.'" *Id.*

Second, it would be appropriate for me to grant summary judgment in Baldor's favor, *sua sponte*, on this ground, if it is appropriate to grant summary judgment to Schlagel on this ground, because Nationwide has had sufficient advance notice of the

timeliness issue as to warranty claims involving goods and an adequate opportunity to demonstrate why summary judgment should not be granted, where Schlagel squarely presented the issue in its summary judgment motion, and Nationwide responded to the issue. *See Figg v. Russell*, 433 F.3d 593, 597 (8th Cir. 2006) ("*Sua sponte* orders of summary judgment will be upheld 'only when the "party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted."'" (quoting *Shur-Value Stamps, Inc. v. Phillips Petroleum Co.*, 50 F.3d 592, 595 (8th Cir. 1995), in turn quoting *Interco Inc. v. Nat'l Sur. Corp.*, 900 F.2d 1264, 1269 (8th Cir. 1990)); *Stone Motor Co. v. General Motors Corp.*, 400 F.3d 603, 607 (8th Cir. 2005) ("A district court may grant summary judgment sua sponte if 'the losing party was on notice that she had to come forward with all of her evidence.'" (quoting *Celotex Corp.*, 477 U.S. at 326)); *Hubbard v. Parker*, 994 F.2d 529, 531 (8th Cir. 1993)). Certainly, it would be futile to consider the merits of this claim against Baldor, if the claim is time-barred.

*i.* ***Arguments of the parties***. As to its timeliness challenge to this claim, Schlagel argues, on the basis of IOWA CODE § 554.2725(2), that the applicable five-year statute of limitations began to run at the time of tender of the goods, so that the statute of limitations expired in 2003. Schlagel then cross-references its statute of limitations argument to a "Section IV.A." of its brief, but there is no such section in its brief. There is, however, a Section III.D. that discussed the statute of limitations for a claim of breach of implied warranty of fitness for a particular purpose, which adds an argument that the statute of limitations begins to run at the time of delivery, even though the buyer does not know the goods are defective. In response, Nationwide contends that the "discovery rule" tolls the statute of limitations on common-law warranty claims until the time when the explosion occurred, and its lawsuit was filed the same year as the explosion. Nationwide

argues that Schlagel improperly focuses on a statutory warranty claim, but Iowa law recognizes both statutory and common-law claims based on implied warranties. In reply, Schlagel contends that Nationwide's argument for application of the discovery rule, to defeat its statute of limitations argument, is flawed, because the case on which Nationwide relied was not a "goods" case, but this one is.

  ***ii. Analysis***. The parties apparently agree that the statute of limitations applicable to Nationwide's breach-of-implied-warranty claims is the following:

> Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:
> * * *
> **4. Unwritten contracts—injuries to property—fraud—other actions.** Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years, except as provided [for claims not presented here].

IOWA CODE § 614.1(4). What they dispute is the "trigger" for the running of this five-year statute of limitations in this case.

  Nationwide contends that the "discovery rule" applies here, which Schlagel disputes. "Under the discovery rule, a cause of action does not accrue until the injured party has actual or imputed knowledge of the facts that would support a cause of action." *Speight v. Walters Dev. Co., Ltd.*, 744 N.W.2d 108, 116 (Iowa 2008); *Brown v. Ellison*, 304 N.W.2d 197, 200 (Iowa 1981) ("The discovery rule, when applicable, commences the period of limitations to run from the later of the date of the discovery or the date when, by the exercise of reasonable diligence, the plaintiff should have discovered the wrongful act."); *see also Franzen v. Deere and Co.*, 334 N.W.2d 730, 732 (Iowa 1983) (clarifying

that the court "misspoke" in *Brown* when it said the period would begin to run from the later of two dates, when the injury was discovered or when, by the exercise of reasonable diligence, it should have been discovered, holding "that the period should run from the earlier, not the later, of the two dates").

However, *Speight*, on which Nationwide relies, demonstrates that this "discovery rule" is not applicable here. As the Iowa Supreme Court explained in *Speight*, under IOWA CODE § 554.2725(2), all actions for breach of implied warranty involving "goods" "accrue at the time of delivery, not at the time the damage is discovered." *Speight*, 744 N.W.2d at 116; IOWA CODE § 554.2725(2) ("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."). I will call the rule in § 554.2725(2) the "delivery rule," to distinguish it from the common-law "discovery rule."

In *Speight*, the Iowa Supreme Court agreed with the plaintiffs that their claim was not based on the sale of "goods" and, therefore, § 554.2725(2) did not apply. *Id.* The court explained,

> Goods are "all things . . . which are movable at the time of identification to the contract for sale." [IOWA CODE] § 554.2105(1). Clearly, the construction of a home is not a transaction for the sale of goods to which the UCC applies. Therefore, the limitation provided in section 554.2725(2) does not apply to cases such as the present one. We made that clear in *Brown v. Ellison*, 304 N.W.2d 197 (Iowa 1981), in which we distinguished cases involving breach of implied warranties of workmanship from those under the UCC.

61

> We hold that the discovery rule is applicable to cases arising from express and implied warranties. This holding, of course, does not apply to situations in which statutes expressly provide that a cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *See, e.g.,* Iowa Uniform Commercial Code, § 554.2725. . . . The trial court was, therefore, correct in applying the discovery rule.
>
> *Brown*, 304 N.W.2d at 201.

*Speight*, 744 N.W.2d at 116.

While the "discovery rule" applied in *Speight*, because the construction of a home was not a "good," it is equally clear that the "discovery rule" does *not* apply here, pursuant to IOWA CODE § 554.2725(2), where the elevator legs clearly were "goods." *Cf. Speight*, 744 N.W.2d at 116 (holding that the case did not involve "goods," citing IOWA CODE § 554.2105(1), so that the U.C.C. "delivery rule" was not applicable); *see also Brown*, 304 N.W.2d at 201 (holding that the "discovery rule" was applicable to cases arising from express and implied warranties, but in a case arising from failure to construct a properly drilled well, not a case involving "goods"); *but see Franzen v. Deere and Co.*, 334 N.W.2d 730, 732 (Iowa 1983) (finding that the discovery rule did apply to a "products liability case" arising from a personal injury involving claims of both strict liability in tort and breach of implied warranties of fitness for particular use and merchantability).

Nationwide's assertion that its claim based on the implied warranty of merchantability is a "common-law" claim is a red herring. While Iowa common-law undoubtedly recognizes some common-law implied warranty claims, *see Chicago Cent. & Pac. R.R. Co. v. Union Pac. R.R. Co.*, 558 N.W.2d 711, 715 (1997) (common-law implied warranty of fitness for a particular purpose), Nationwide has not cited, and I have not found, any Iowa cases recognizing a common-law implied warranty of merchantability.

Neither *Speight* nor *Wright* is to the contrary. *Speight*, 744 N.W.2d at 110 (addressing a common-law claim of breach of implied warranty of workmanlike construction, not a claim of breach of implied warranty of merchantability); *Wright*, 652 N.W.2d at 179 (examining the implied warranty of merchantability pursuant to § 554.2314). A claim of breach of implied warranty of merchantability, at least as to "goods," is statutory. *See, e.g., Wells Dairy, Inc. v. American Indus. Refrigeration, Inc.*, 762 N.W.2d 463, 474 (Iowa 2009) (implied warranties of fitness for ordinary use or merchantability and fitness for a particular purpose "arise by operation of law in connection with the sale of goods," citing IOWA CODE §§ 554.2314 (implied warranty of merchantability—usage of trade) and 554.2315 (implied warranty of fitness for a particular purpose)).

Because Nationwide's claim of breach of implied warranty of merchantability against Schlagel is not subject to the "discovery rule," Schlagel is entitled to summary judgment on that claim, because it is time-barred by the applicable five-year statute of limitations from the time of delivery of the elevator legs. *See* IOWA CODE §§ 618.1(4) (statute of limitations); 554.2725(2) (time runs from delivery of goods). I need not and will not consider Schlagel's other grounds for summary judgment on this claim.[10]

Precisely the same analysis would apply to the timeliness of Nationwide's claim of breach of implied warranty of merchantability against Baldor. Nationwide has been fully heard on the issue of the timeliness of a claim of breach of implied warranty of merchantability arising from the sale of "goods," so that entry of summary judgment *sua*

---

[10]Schlagel's additional grounds were that it adequately disclaimed all implied warranties and that Nationwide cannot prevail on such a claim, because Nationwide has failed to identify specific promises made by Schlagel that would support such an implied warranty. As to the latter contention, Schlagel contends that Nationwide's own experts have testified that the bearings at issue failed because of inadequate lubrication, not because of any breach of any promise by Schlagel giving rise to a warranty.

*sponte* in Baldor's favor on the untimeliness of the claim is also appropriate. *See Figg v. Russell*, 433 F.3d at 597. Because Baldor is entitled to summary judgment on this claim on the ground that it is untimely, I also need not consider Baldor's specified ground for summary judgment on this claim.[11]

### 2. *Warranty of fitness for a particular purpose*

Nationwide asserts claims of breach of the implied warranty of fitness for a particular purpose against SMA (Division III), Schlagel (Division IX), and Baldor (Division XIV). All three defendants move for summary judgment on these claims against

---

[11]The ground that Baldor asserted was that, under Iowa law, a claim of breach of the implied warranty of merchantability requires the same proof as is required to establish product defect claims under the RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2. Baldor argues that, for the same reasons that it was entitled to summary judgment on Nationwide's product defect claims against it, it is also entitled to summary judgment on Nationwide's claim of breach of the implied warranty of merchantability. Nationwide responds that it had generated genuine issues of material fact on Baldor's *design defect* claim. In *Wright*, the Iowa Supreme Court held, "[C]onduct that gives rise to a warranty claim based on fitness for ordinary purposes mirrors conduct that gives rise to tort liability for a defective product. Thus, warranty liability under section 554.2314(2)(c) requires proof of a product defect as defined in Products Restatement section 2." *Wright*, 652 N.W.2d at 180-82. While I find nothing in *Wright* suggesting that only "design defect" claims must be viable for a "breach of warranty of merchantability" claim to survive, *see Wright*, 652 N.W.2d at 182 (drawing the parallel between "breach of warranty of merchantability" claims and product defect claims pursuant to RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, and § 2 product defect claims *include* design, manufacturing, and *warning* defect claims), Nationwide has apparently narrowed its claim of breach of implied warranty of merchantability against Baldor to relate *only* to the design defects it asserted against Baldor. I disagreed with Nationwide's contention that it had generated genuine issues of material fact on the *design defect* claim against Baldor, above. Thus, I would also grant summary judgment for Baldor on this claim on the ground that Nationwide has failed to generate genuine issues of material fact on conduct that gives rise to the warranty claim.

them, but they do so on slightly different grounds. I will again consider their challenges defendant-by-defendant.

### a.    *The claim against SMA*

*i.    Arguments of the parties*. SMA acknowledges that a claim of breach of implied warranty of fitness for a particular use may be either statutory or common-law, but that the tests for the two claims are quite similar and that Nationwide cannot prevail on whichever theory it is asserting. SMA argues that, for this claim against a contractor who agrees to build a structure for a particular purpose, Nationwide must plead the particular purpose for which the building is intended, but Nationwide has failed to do so. SMA also argues that Nationwide cannot prove that a breach of such a warranty caused any damage to Nationwide.

Nationwide contends that SMA's argument is cursory and erroneous. Nationwide argues that the purpose of a grain elevator can be inferred from the name of the structure. Nationwide argues that this is a case in which it is obvious that the ordinary purpose and particular purpose of a grain elevator are the same. Nationwide also alleges that it has adequately pleaded a number of representations that SMA made about the safety and "state of the art" quality of the grain elevator that it would build. Nationwide contends that it is not required to plead the obvious. Nationwide argues that there can be no dispute that the Iowa Supreme Court has recognized an implied warranty of fitness for a particular purpose against a contractor who agrees to build a structure for a particular purpose. Finally, Nationwide argues that it has generated genuine issues of material fact that SMA's breach of this implied warranty caused damage by pointing to all of the evidence that it has amassed showing that the Alton grain elevator was not safe to use as a grain elevator owing to omissions of critical safety features.

In reply, SMA reiterates that it is entitled to summary judgment on this claim, because Nationwide blurs the differences between breach of the implied warranty of merchantability, which is a warranty of fitness for ordinary purposes, and the implied warranty of fitness for a particular use. Notice pleading is not enough, SMA argues: Nationwide must generate genuine issues of material fact on the right claim. SMA argues that Nationwide presents no "bargain-related" facts in its Resistance to support a particular use of the grain elevator.

*ii.* ***Analysis.*** Some time ago, the Iowa Supreme Court recognized an implied warranty of fitness for a particular purpose in a contract to build or install a structure:

> [W]e adopt the following as a summary and extension of the construction contract implied warranty:
>
>> Where a contractor agrees to build a structure to be used for a particular purpose, there is an implied agreement on his part that the structure when completed will be serviceable for the purpose intended. . . .
>>
>> Where the contract contains a guarantee or warranty, express or implied, that the contractor's work will be sufficient for a particular purpose or to accomplish a certain result, unless waived by the owner, the risk of accomplishing such purpose or result is on the contractor, and there is no substantial performance unless the work is sufficient for such purpose or accomplishes such result.
>
> 17A C.J.S., Contracts, § 494(2)(a), at 715-16 (1963).

*Semler v. Knowling*, 325 N.W.2d 395, 397-98 (Iowa 1982). Thus, the implied warranty of fitness for a particular purpose is not limited to "chattel sales" and applicability of the warranty "does not catapult contracts for [construction] into the ambit of Article 2 of the Uniform Commercial Code," because a contract for construction or installation is "predominantly a contract for services." *Id.* at 398.

In *Semler*, the Iowa Supreme Court also identified the elements of recovery on such a claim:

> The following elements for recovery must be present under the theory of implied warranty of fitness for a particular purpose:
> (1) the seller must have reason to know the consumer's particular purpose;
> (2) the installation contractor must have reason to know that the consumer is relying on his skill or judgment to furnish appropriate installation services; and
> (3) the consumer must, in fact, rely upon the installer's skill or judgment.
>
> *See* [*Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 110 (Iowa 1981)]; Iowa Code § 554.2315 (1981).

*Semler*, 325 N.W.2d at 399 (footnote omitted). "To give rise to an implied warranty the contract must respond to a particular need of the consumer, not just to general purposes." *Id.* at n.2 (citing *Jacobson v. Benson Motors, Inc.*, 216 N.W.2d 396, 403-404 (Iowa 1974)). Moreover, "[w]hether such a warranty arises is usually a question of fact determined from the circumstances of the parties' negotiations." *Id.* at 399. In *Semler*, the particular purpose was to meet the plaintiff's "peculiar needs" for a working hook-up with the main sewer line without cutting through new paving. *Id.*

It is difficult to discern here the required "particular purpose" or "peculiar need." There is no doubt that the *purpose* of the grain elevator here was to be a grain elevator, but that conclusion does nothing to establish the particular needs of Midwest Farmers Cooperative, just the general purpose for the construction project. *See id.* & n.2 Nationwide also has not generated any genuine issues of material fact as to a "peculiar need" that was known to SMA, from either the pleadings or Nationwide's briefing on the summary judgment motion. *See id.* I doubt that a "safe" grain elevator is a "peculiar need," because an elevator must also be "safe" to serve its general or ordinary purpose of

storing and protecting grain. It appears that, at least now, Nationwide asserts that its "particular purpose" or "peculiar need" was a "state of the art" grain elevator and that this is what SMA promised to construct. Nationwide has not shown, however, that this "purpose"—even if it were more than "puffery"—was formulated at the time that the parties entered into the contract for the construction of the grain elevator with any of the specificity concerning various safety features that Nationwide now asserts should have gone into a "state of the art" grain elevator. Indeed, a grain elevator could be "state of the art" in any number of respects that do not necessarily go to safety, such as speed and volume of grain handling, capacity, storage conditions, or energy usage. Certainly, there is nothing here like the specificity of purpose of a working hook-up with the main sewer line without cutting through new pavement identified in *Semler* as a "peculiar need" from the beginning of the parties' relationship. *See id.*

Therefore, SMA is entitled to summary judgment on this claim of breach of the implied warranty of fitness for a particular purpose.

### b. Timeliness of the claim against Schlagel and Baldor

Only Schlagel asserts that it is entitled to summary judgment on Nationwide's claim of breach of the implied warranty of fitness for a particular purpose on the ground that the claim is untimely. Nevertheless, as with the claim based on breach of the implied warranty of merchantability, I will also consider, *sua sponte*, whether Baldor is also entitled to summary judgment on this claim on the ground that it is untimely. *See supra* at 58.

### i. Arguments of the parties.
As with the Nationwide's claim against Schlagel based on the implied warranty of merchantability, Schlagel contends that this claim based on the implied warranty of fitness for a particular purpose is time-barred by the applicable five-year statute of limitations, because the "discovery rule" is inapplicable. Similarly,

Nationwide also reiterates here, with regard to the claim based on the implied warranty of fitness for a particular purpose, its responses to Schlagel's statute of limitations arguments concerning the claim based on the implied warranty of merchantability. In reply, Schlagel contends that Nationwide should not be able to pick and choose whether it is asserting a common-law or statutory implied warranty claim, where the statutory claim plainly applies to the "goods" at issue and, hence, the "discovery rule" does not salvage an untimely claim.

 *ii.* ***Analysis***. Nationwide is correct that, "[u]nder Iowa law there are both statutory and common-law implied warranties of fitness for a particular purpose." *Chicago Cent. & Pac. R.R. Co. v. Union Pac. R.R. Co.*, 558 N.W.2d 711, 715 (1997). However, this does not necessarily mean that a party can choose to assert one or the other or both in any particular circumstances, for example, where the claim involves the sale of "goods," as it does here against Schlagel and Baldor. *See supra* at page 58. Nationwide simply assumes that it can assert both kinds of claims, then asserts that the common-law claim is timely under the "discovery rule," even if the statutory claim is time-barred.

 The Iowa Supreme Court's decision in *Chicago Central & Pacific Railroad Company* does not support the contention that *both* common-law and statutory claims can be asserted on the same facts or in the same contexts. Rather, in that decision, the Iowa Supreme Court cited as authority for *statutory* implied warranties of fitness for a particular purpose Iowa Code § 554.2315, which establishes such a warranty for the sale of "goods," and § 554.13213, which establishes such a warranty for leases, but cited cases recognizing an implied warranty of fitness for a particular purpose in the context of bailments or contracts for hire. *Chicago Cent. & Pac. R. Co.*, 558 N.W.2d at 714 & n.1 (citing *Berhow v. Kroack*, 195 N.W.2d 379, 381 (Iowa 1972), which involved an oral rental agreement that "created a bailment for mutual benefit, which in effect makes it one

for hire," which, by operation of law, imposed on the bailor "an obligation similar to an implied warranty of fitness in the sale of personal property"; *Meester v. Roose*, 259 Iowa 357, 359-60, 144 N.W.2d 274, 275-76 (1966), which recognized that "warranties, express or implied, may attend bailments as well as sales"; and *Morris Plan Leasing Co. v. Bingham Feed & Grain Co.*, 259 Iowa 404, 417, 143 N.W.2d 404, 413 (1966), which involved breach of the implied warranty in the context of a bailment). In *Chicago Central*, the Iowa Supreme Court also found that "[a] bailment can create a common-law implied warranty of fitness," as a matter of common-law, then concluded that "a common-law implied warranty of fitness can arise in matters involving commercial leases." *Id.* at 714-15. The case itself involved a commercial lease of railroad cars from one railroad to another; it did not involve the sale of "goods." *Id.* Nationwide has not cited, and I have not found, cases involving the sale of "goods" in which the court recognized a common-law implied warranty of fitness for a particular purpose, at least not one that did not also involve personal injuries. *Cf. Speight*, 744 N.W.2d at 116 (holding that the case did not involve "goods," citing IOWA CODE § 554.2105(1), so that the U.C.C. "delivery rule" was not applicable); *see also Brown*, 304 N.W.2d at 201 (holding that the "discovery rule" was applicable to cases arising from express and implied warranties, but in a case arising from failure to construct a properly drilled well, not a case involving "goods"); *but see Franzen v. Deere and Co.*, 334 N.W.2d 730, 732 (Iowa 1983) (finding that the "discovery rule" did apply to a "products liability case" arising from a personal injury involving claims of both strict liability in tort and breach of implied warranties of fitness for particular use and merchantability). I conclude that only a statutory claim for breach of implied warranty of fitness for a particular purpose is available for a case involving the sale of "goods."

Thus, for essentially the same reasons that I concluded, above, beginning at page 60, that the *statutory* implied warranty of merchantability claim against Schlagel is time-

barred, I now conclude that the *statutory* implied warranty of fitness for a particular purpose claim against Schlagel is also time-barred:   Under IOWA CODE § 554.2725(2), all actions for breach of implied warranty involving the sale of "goods" "accrue at the time of delivery, not at the time the damage is discovered." *Speight*, 744 N.W.2d at 116; IOWA CODE § 554.2725(2).  Delivery occurred in 1998, so the statute of limitations ran in 2003, well before Nationwide asserted the present warranty claim.

Baldor, as well as Schlagel, is entitled to summary judgment on Nationwide's claims of breach of the implied warranty of fitness for a particular purpose, because those claims are time-barred.   This is the sole ground on which Schlagel is entitled to summary judgment on this claim.[12]  On the other hand, I conclude that Baldor would be entitled to

---

[12]Schlagel's additional grounds for summary judgment on this claim were that it effectively disclaimed the warranty and that Nationwide cannot show that it was aware of Midwest Farmers Cooperative's particular purpose for the elevator leg or knew that Midwest Farmers Cooperative was relying on Schlagel to meet that particular purpose.

Even if I were to hold that the disclaimer was sufficiently conspicuous, as a matter of law, the ground on which Schlagel has moved for summary judgment, Nationwide has demonstrated that there are, at the very least, genuine issues of material fact on other considerations as to the effectiveness of the disclaimer.  Specifically, Schlagel's disclaimer, only provided at the time of delivery of the elevator legs, well after SMA and Schlagel had entered into a bargain for the design and manufacture of the elevator legs to SMA's needs in constructing the Alton grain elevator, for Midwest Farmers Cooperative's benefit, was ineffective.  *See Bowdoin v. Showell Growers, Inc.*, 817 F.2d 1543, 1545 (11th Cir. 1987) (holding that post-sale disclaimers are ineffective in the context of Alabama's version of the U.C.C., citing Ala. Code § 7-2-316(2)); *Turner v. Kunde*, 128 N.W.2d 196, 197-98 (Iowa 1964) (recognizing that "a disclaimer [of any warranty] after the agreement had been made could not vary it," in a case involving a disclaimer of warranties in a sales slip for cattle provided only at the time of delivery, long after the bargain was reached).

As to summary judgment on the merits, there is evidence from which a reasonable jury could find that Schlagel knew, through SMA, Midwest Farmers Cooperative's particular purposes for the elevator legs, knew that Midwest Farmers Cooperative was

(continued...)

summary judgment on this claim on the merits, if the claim had been timely.[13]

### 3.    Warranty of workmanlike manner

Nationwide's last implied warranty claim is a claim for breach of implied warranty of workmanlike manner.  Nationwide asserts such a claim against SMA (Division IV), Schlagel (Division X), and Baldor (Division XV).  All three defendants have moved for summary judgment on these claims.

---

[12](…continued)
relying on Schlagel's skill to furnish an appropriate elevator leg, and that Midwest Farmers Cooperative did, indeed, rely on Schlagel's skill to provide an elevator leg that was up to the task, consisting of evidence that Schlagel knew that SMA required an elevator leg custom-built to site-specific criteria provided by SMA, including blueprints of the Alton facility, blueprints of the leg, and other information peculiar to the site, and Schlagel purported to have an engineering department devoted to helping customers design the right equipment to meet the special needs of their applications, and the ordering process for a particular leg was long and detailed.

[13]I agree with Baldor that Nationwide has failed to generate any genuine issues of material fact that Baldor knew the particular purpose of the particular bearing, or that anyone—Schlagel, Midwest Farmers Cooperative, or GEECO—was relying on Baldor to select the particular bearing that ultimately ended up in the elevator leg on the Alton grain elevator.  Evidence cited by Nationwide does give rise to inferences that, *at times*, Schlagel had drawn upon Baldor's expertise with bearings and that Baldor was aware that Schlagel was doing so.  Nothing connects those times to *this* particular project (the Alton grain elevator) or to the elevator leg ultimately incorporated into the Alton grain elevator sufficiently to create an implied warranty of fitness of the Dodge bearing for a particular purpose.  The lack of connection is even more glaring, where it is undisputed that the bearing at issue is a multi-purpose bearing that can be used for any number of purposes in any number of different industries or applications, and where the bearing was sold "blind" to a distributor that stocked and sold the bearing along with other bearings and other products, the year before the bearing was purchased by Schlagel to be incorporated into the elevator leg for the Alton grain elevator.

### a. The claim against SMA

*i.* **Arguments of the parties.**  SMA argues that, under Iowa law, the implied warranty of workmanlike manner is designed to be used when home construction is at issue, based on a policy of protecting home buyers who are in an inferior bargaining position compared to experienced home builders.  SMA argues that the policy reasons for implying such a warranty are not present in this case.  Even if the warranty is applicable in the circumstances presented here, SMA contends that Nationwide cannot generate a genuine issue of material fact that SMA breached the warranty.  SMA argues that it did not design, manufacture, or install any of the systems that Nationwide alleges were defective, so that there is no specific defect, in breach of the warranty, for which SMA could be responsible.

Nationwide contends that Iowa courts have expressly extended the reach of the implied warranty of workmanlike manner beyond residential construction to construction of commercial facilities, including construction of agricultural facilities and roads and construction projects generally.  Nationwide also points out that the Minnesota Supreme Court relied on an Iowa decision to extend the warranty to allow a grain elevator relief for faulty construction.  Nationwide points out that SMA cites no cases refusing to apply the warranty outside of residential construction or expressly limiting it to residential construction.  Nationwide also argues that, as the designer and general contractor for the elevator, SMA was under a duty to perform in a workmanlike manner.  Had SMA chosen appropriate components for the elevator, Nationwide contends, the result would not have been an unsafe and unfit elevator.

In reply, SMA points out that Nationwide cites no recent authority from the Iowa Supreme Court suggesting that warranty claims based on performance in a workmanlike manner are applicable in a commercial context and contends that the older cases cited by

Nationwide offer dubious support, because one is actually a breach of contract case, not an implied warranty case, and the other is unclear about the precise implied warranty at issue. SMA argues that recent Iowa precedent suggests that the warranty of workmanlike manner should not apply outside of the residential construction context. SMA reiterates that it was not the designer of any of the allegedly defective systems on which Nationwide now premises its warranty of workmanlike manner claim.

*ii.*    ***Analysis***.   I reject SMA's argument that a claim of breach of the implied warranty of workmanlike manner is not available outside the context of residential construction contracts.  I cannot simply ignore the Iowa Supreme Court's prior recognition of a broader scope to the implied warranty, despite that court's more recent focus on warranty in the context of the home construction contract, because I find nothing in *Speight*, on which SMA relies, that suggests an intention by the Iowa Supreme Court to overrule or limit its prior broader recognition of the claim.  Rather, I find that, in *Speight*, the court discussed the implied warranty in the context of home building, because that was the kind of case before it, but neither expressly nor impliedly limited the implied warranty to that context.  *See Speight*, 744 F.3d at 110-15.

The case of *Kirk v. Ridgway*, 373 N.W.2d 491 (Iowa 1985), on which *Speight* relies, certainly does not cast the circumstances in which the warranty arises so narrowly. In *Kirk*, the court first framed the rule to be that, "[i]n construction contracts there is an implied warranty that the building to be erected will be built in a reasonably good and workmanlike manner and that it will be reasonably fit for the intended purpose," without reference or limitation to home building.  373 N.W.2d at 493.  The court cited in support of this rule, *inter alia*, a case involving construction of a commercial building.  *Id.* (citing *Markman v. Hoefer*, 252 Iowa 118, 123, 106 N.W.2d 59, 62 (1960), which involved construction by the defendant of a building used for curing and storing onions grown by

74

the plaintiff). The *Markman* decision cannot be dismissed, in turn, as blithely as SMA contends, because it is not simply a "breach of contract" case, but one expressly considering whether the building contract was breached by breach of the warranty of workmanlike manner. *Markman*, 106 N.W.2d at 62 ("In building and construction contracts, in the absence of an express agreement to the contrary, it is implied that the building will be erected in a reasonably good and workmanlike manner and will be reasonably fit for the intended purpose. . . . There is substantial evidence the roofs of the tunnel and of each warehouse were not constructed in a good and workmanlike manner in the respects heretofore noted. Hence the ruling on defendant's motion may not be upheld on the first ground asserted—that no breach of the contract was shown." (citations omitted)).

Thus, SMA is not entitled to summary judgment on this claim on the ground that the implied warranty of workmanlike manner does not extend beyond the context of home construction.

SMA's alternative ground for summary judgment on this claim is that it did not breach the warranty as a matter of law, because it did not design, manufacture, or install any of the systems that Nationwide alleges were defective, so that there is no specific defect, in breach of the warranty, for which SMA could be responsible. Nationwide also argues that, as the designer and general contractor for the elevator, SMA was under a duty to perform in a workmanlike manner, but chose inappropriate components, resulting in an unsafe and unfit elevator.

Reformulating the elements of this claim of breach of implied warranty to the commercial building context, Nationwide must ultimately prove the following: (1) that the Alton grain elevator was constructed to be used as a grain elevator; (2) that SMA built or constructed the Alton grain elevator for use by another (Midwest Farmers Cooperative);

(3) that when turned over to Midwest Farmers Cooperative, the grain elevator was not reasonably fit for its intended purpose or had not been constructed in a good and workmanlike manner; (4) that, at the time the grain elevator was turned over to Midwest Farmers Cooperative, Midwest Farmers Cooperative was unaware of the defect and had no reasonable means of discovering it; and (5) that by reason of the defective condition, Midwest Farmers Cooperative suffered damages. *Cf. Speight*, 744 N.W.2d at 111 (citing *Kirk*, 373 N.W.2d at 496). I cannot find that whether or not SMA "designed" any of the systems that were alleged to be defective is dispositive of Nationwide's claim of breach of the implied warranty of workmanlike manner. Indeed, in both *Speight* and *Kirk*, the court defined the "builder" against whom the claim can be asserted as "'a general building contractor who controls and directs the construction of a building, has ultimate responsibility for completion of the whole contract and for putting the structure into permanent form,'" so that the definition "'necessarily exclud[es] merchants, material men, artisans, laborers, subcontractors, and employees of a general contractor.'" *Kirk*, 373 N.W.2d at 496 (quoting *Jeanguneat v. Jackie Hames Constr. Co.*, 576 P.2d 761, 762 n.1 (Okla. 1978)); *see also Speight*, 744 N.W.2d at 111 (quoting *Kirk*). SMA was certainly the "general building contractor" and, thus, is the correct entity against whom the claim can be brought. Moreover, Nationwide has generated genuine issues of material fact that, by virtue of the various defects alleged, and for which SMA, as the "builder," was ultimately responsible—because it was ultimately responsible for completion of the whole contract and for putting the structure into permanent form—SMA breached the implied warranty of workmanlike manner.

SMA is not entitled to summary judgment on this claim.

### b. The claim against Schlagel and Baldor

In light of the foregoing analysis of the proper entity against whom a claim of breach of the implied warranty of workmanlike manner can be brought, it is clear that both Schlagel and Baldor are entitled to summary judgment on this claim. Schlagel contends that Nationwide's insured, Midwest Farmers Cooperative, contracted with another party, SMA, to deliver a grain elevator, and that Schlagel did not sell directly to Midwest Farmers Cooperative, but was a subcontractor for the provision of certain pieces of equipment. Schlagel plainly was not a "builder" against whom this claim can be brought. *See id.* Indeed, I can find no resistance to summary judgment in favor of Schlagel on this claim in Nationwide's brief. Baldor also contends that a claim of breach of the implied warranty of workmanlike manner is not recognized under Iowa law in these circumstances, because Baldor was not the "builder." Again, I can find no resistance to summary judgment in favor of Baldor on this claim in Nationwide's brief.

Therefore, Schlagel and Baldor are entitled to summary judgment on Nationwide's claim of breach of the implied warranty of workmanlike manner against them.

### D. Breach Of Express Warranties

Nationwide also asserts a claim of breach of express warranties against SMA (Division V), Schlagel (Division XI), and Baldor (Division XVI). All three defendants have moved for summary judgment on these claims.

### 1. The claim against SMA

### a. Arguments of the parties

SMA contends that Nationwide cannot generate genuine issues of material fact on the following elements of its breach of express warranties claim: (1) the existence of an express warranty; (2) Midwest Farmers Cooperative's reliance on any such warranty;

(3) SMA's breach of any such warranty; or (4) damages proximately caused by SMA's breach of the warranty.

More specifically, SMA argues that purported promises of a "turnkey operation" and "state of the art" elevator are insufficient to constitute an express warranty as a matter of law, because those references would be statements of opinion, not affirmations of fact or promises. SMA argues that it intended to, and did, deliver a functional grain elevator. SMA also argues that there is no evidence that Midwest Farmers Cooperative relied on these statements, because SMA already had the job before the statements were made. SMA also argues that there was no breach of the express warranty, if there was one and Midwest Farmers Cooperative relied on it, because SMA did deliver a "turnkey operation," that is, one in a state of readiness for immediate use, and Nationwide cannot prove that the elevator was not "state of the art," because it cannot prove that SMA failed to provide what was technologically and practically feasible in terms of safety and technology features when the elevator was constructed. Finally, SMA argues that there is no record to support Nationwide's allegations that breach of express warranties caused damage to Nationwide or Midwest Farmers Cooperative. SMA contends that the failure, if any, to deliver a "turnkey operation" could not proximately cause damage ten years after construction was completed, and even if SMA failed to deliver a "state of the art" elevator, the record is replete with evidence of substandard maintenance and housekeeping by Midwest Farmers Cooperative, including permanently disabling safety systems, all long after delivery of the elevator to Midwest Farmers Cooperative, cutting the causal connection to any breach of warranties by SMA. SMA asserts that it never promised to deliver an elevator that would run on its own without further maintenance and safety monitoring by Midwest Farmers Cooperative.

Nationwide contends that SMA breached its express warranty to provide "state of the art" features. Nationwide contends that SMA promised a facility that had the safety features and the "state of the art" equipment in it that was available at the particular time. It contends that the scope of SMA's express warranty is a jury question, because the "real" question is whether SMA provided an express warranty when it agreed to provide a turnkey facility with "state of the art" safety systems. Nationwide contends that "state of the art" is capable of definition as use of best available technology reasonably available at the time and, thus, capable of being the basis for an express warranty. Nationwide also argues that combining the "turnkey" requirement with the "state of the art" requirement means that SMA was obligated to turn over a safe working elevator that was ready without any adjustments to the elevator. In other words, the elevator was supposed to be in such a condition, custom-built for Midwest Farmers Cooperative, that Midwest Farmers Cooperative would not need to add anything to it for safety or otherwise. Nationwide contends that Midwest Farmers Cooperative "obviously" relied on SMA's express warranty, because the parties were intimately aware that grain dust explosions are the greatest risk to the facility, so that they would try to eliminate ignition sources. Nationwide also argues that SMA breached the warranty by providing a dangerous elevator more prone to explosion risk and more likely to be damaged in explosions, not less so, because there were numerous defects and safety violations in the design, assembly, and construction of the elevator, including its component parts. Finally, Nationwide argues that a "sole proximate cause" defense is not available to SMA, because the maintenance problems that SMA asserts caused or contributed to the explosion were foreseeable by SMA. Indeed, Nationwide argues that the facility was clean and the sensor on the bearing was turned on the day the explosion occurred. Nationwide also argues that, but for the

lack of expansion bearings, the explosion would not have occurred, even if there were other maintenance problems.

In reply, SMA argues that Nationwide has only cited testimony about what Midwest Farmers Cooperative was seeking in the construction of the elevator, not evidence that SMA expressly warranted those features to Midwest Farmers Cooperative. SMA argues that any alleged statements pertaining to a "turnkey operation" or to providing a "state of the art" facility pertained merely to the value of the goods or were the seller's opinion or commendation, which is not sufficient to create an express warranty.

### b.    Analysis

SMA and Nationwide agree that the Iowa Supreme Court's decision in *Flom v. Stahly*, 569 N.W.2d 135 (Iowa 1997), provides the legal authority for a claim of breach of express warranties by a builder. In *Flom*, the Iowa Supreme Court explained,

> Although words such as "warranty" or "guaranty" need not be used to create an express warranty, the plaintiff must
>> show that the seller made some distinct assertion of quality concerning the thing to be sold as distinguished from a mere statement of opinion or of praise, and that he intended such assertion to be believed and relied on by the purchaser as an undertaking on his part that the article is what he represents it to be, and that it was so understood and believed and relied on by the purchaser.
>
> *Carleton D. Beh Co. v. City of Des Moines*, 228 Iowa 895, 900, 292 N.W. 69, 71 (1940) (citing *Zimmerman v. Brannon*, 103 Iowa 144, 147, 72 N.W. 439, 440 (1897)).

*Flom*, 569 N.W.2d at 140. The court in *Flom* also required that the plaintiff show that the breach of the express warranty was the "proximate cause" of damage to the plaintiff. *Id.* I conclude that the elements of Nationwide's claim of breach of express warranty against SMA, in light of *Flom*, are the following:   (1) SMA Elevator made an assertion of quality,

not a mere statement of opinion or praise, regarding the elevator that it would build; (2) SMA intended that Midwest Farmers Cooperative would believe and rely upon SMA's statement as a promise on SMA's part that the grain elevator would be what SMA represented it to be; (3) Midwest Farmers Cooperative relied upon SMA's assertion; (4) the grain elevator did not conform to SMA's assertion; and (5) the failure of the grain elevator to conform to the assertion was a proximate cause of Midwest Farmers Cooperative's damage.[14]

---

[14]Iowa Model Civil Jury Instruction 1100.1 states the essentials for recovery on an express warranty claim as follows:

The plaintiff must prove all of the following propositions:

1. The defendant sold [description of the product or service sold] and expressly warranted [the particulars alleged by plaintiff].

2. The plaintiff made the purchase relying on the express warranty.

3. The [description of the product or service] did not conform to the express warranty.

4. The breach of express warranty was a proximate cause of the plaintiff's damage.

5. The amount of damage.

If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, the plaintiff is entitled to damages in some amount.

(continued…)

The first and second elements are close questions here. In *Flom*, the Iowa Supreme Court held that statements, written into the sales contract, about the manner in which the walls of a building and the heating system were to be constructed were not mere expressions of opinion or praise, so that they could give rise to an express warranty claim. *Flom*, 569 N.W.2d at 140. The court also held that, because the statements were made part of the sales contract, the builder indicated that the statements could be believed and relied upon by the buyers, and that there was also testimony by the buyers that they relied on the statements. *Flom*, 569 N.W.2d at 140. Similarly, in *Busker v. Sokolowski*, 203 N.W.2d 301 (Iowa 1972), on which Nationwide places great reliance, the court noted that, "[a]fter considerable discussion [the defendant builder] agreed to build [the plaintiffs] a 'first-class house,'" which the court held could be the basis for a claim of breach of express warranty. 203 N.W.2d at 303. The court also found that the plaintiffs "relied upon defendant to use good quality materials and workmanship." *Id.* In neither case was a bald statement similar to the ones attributed to SMA—that the elevator would be "state of the art" or "turnkey"—the basis for the express warranty. Rather, in both cases, specific discussions about the plaintiff's desires or specific representations by the defendant about its product or services distinguished assertions of quality, on which an express warranty could be based, from mere statements of opinion or praise. *Compare, e.g., Olin Mathieson Chemical Corp. v. Moushon*, 93 Ill. App. 2d 280, 235 N.E.2d 263 (1968) (holding that seller's statements that explosives were of "good quality," would produce "good results," and that customer would be pleased with their use constituted opinions);

[14](...continued)
I note that this formulation of the elements leaves out the requirement that the seller intend that the buyer believe and rely on the seller's representation. *See Flom*, 569 N.W.2d at 140.

*Axion Corp. v. G.D.C. Leasing Corp.*, 359 Mass. 474, 269 N.E.2d 664, 668-669 (1971) (holding that a letter describing a machine as "with few exceptions . . . [a] turnkey operation" was a statement of opinion). Here, the question is whether the bald statements that the elevator would be "turnkey" or "state of the art" were also given more specific content from discussion of the manner of construction or the specific needs or desires of Midwest Farmers Cooperative.

Although perhaps just barely, Nationwide has generated genuine issues of material fact that the content of the alleged express warranties was given sufficient specificity to make those statements assertions of quality, not mere "puffery" or opinion. First, Nationwide has suggested that "state of the art," at least in the context of construction projects, is not too nebulous to support an express warranty claim, because it is understood in that context to mean "generally recognized engineering or safety standard[s], criteria, or design theory" in existence at the time of the construction. *See Fischer v. City of Sioux City*, 695 N.W.2d 31, 34 (Iowa 2005) (citing Iowa Code § 670.4(8), defining a city's "state of the art" defense with respect to the design and construction of public improvements). Nationwide has also pointed to evidence of discussions between SMA and Midwest Farmers Cooperative that gave sufficient factual detail to assertions by SMA, on which it intended that Midwest Farmers Cooperative would rely—that SMA would build a "state of the art" or "turnkey" grain elevator—for those assertions to cross the line from statements of opinion or praise to assertions of quality. For example, Nationwide has pointed to the deposition testimony of Ellis Frank (Skip) Hein, Jr., the general manager and CEO of Midwest Farmers Cooperative at the time, that SMA and Midwest Farmers Cooperative discussed a "turnkey"operation, in which construction would be complete, that would be "state of the art," in the sense of safety features and equipment. *See* Nationwide's Appendix (docket no. 161) at 454-55 (deposition of Mr. Hein at 40-41).

The element requiring proof that the buyer did actually rely upon the assertions in question, *see Flom*, 569 N.W.2d at 140, is also a close call here, because, as SMA points out, Mr. Hein also suggested in his deposition testimony that SMA was already the "lead company" for the Alton grain elevator job and that Midwest Farmers Cooperative was "virtually committed" to using SMA at the time that he became CEO. *See id.* at 453 (deposition of Mr. Hein at 38). However, further testimony by Mr. Hein is sufficient to generate genuine issues of material fact that the alleged assertions did finally tip the balance in favor of choosing SMA for the job, because Mr. Hein testified that the contractor that ultimately got the bid was going to provide a "turnkey" operation with the "state of the art" safety features and equipment that Midwest Farmers Cooperative wanted. *Id.* at 454 (deposition of Mr. Hein at 40).

The "breach" and "proximate cause" elements, *see Flom*, 569 N.W.2d at 140, are also problematic for Nationwide, where there was, as SMA asserts, a considerable period of time between SMA's completion of the Alton grain elevator and the explosion, as well as evidence that, during that time, many maintenance procedures were not followed and the safety equipment was sometimes turned off. In *Flom*, the Iowa Supreme Court found that the "proximate cause" element had been satisfied by expert testimony tending to show that the failure to use the construction techniques specified in the written materials led to the moisture problems in the outer wall and the deterioration of the heating ducts. *Flom*, 569 N.W.2d at 140. Here, there is also evidence from experts that lack of maintenance was not the sole proximate cause of the grain elevator explosion itself or of the extent of the damage that the explosion caused, but that errors in the original construction of the grain elevator, particularly as to safety equipment and safety features that did not conform to "state of the art" standards, for example, as set forth in NFPA 61, either caused or contributed to the damage. *See also Busker*, 203 N.W.2d at 303 (finding breach of the

express warranty to build a "first-class house" where, within a year after construction, the buyers began to observe defects in the concrete driveway, garage floor, and patio, including cracks, pits, heaving, tipping, and improper drainage, as well as a loose kitchen sub-floor, nail poppings in fiberboard in the bedrooms, and a crack in the corner of a bedroom wall).

Therefore, SMA's motion for summary judgment on Nationwide's claim of breach of express warranty will be denied.

### 2. The claims against Schlagel and Baldor

The claims of breach of express warranties against Schlagel and Baldor present somewhat different issues, because they relate to their "products," rather than to construction of the grain elevator in its entirety. There is no dispute that the U.C.C., and more specifically IOWA CODE § 554.2313, applies to these express warranty claims.

#### a. Arguments of the parties

##### i. The arguments as to Schlagel. Schlagel argues that, while IOWA CODE § 554.2313 explains how an express warranty for goods is created, IOWA CODE § 554.2318 does not extend the reach of such a warranty to third-party beneficiaries, such as Midwest Farmers Cooperative, who have suffered only economic loss, because the Iowa Supreme Court has interpreted the term "injured" to include only "physical harm to the plaintiff or his property." Schlagel also argues that, so far, Nationwide has not identified any written materials or express statements in support of its allegations that Schlagel breached some express warranty, let alone any statement that served as the basis for the bargain. I have found nothing in Nationwide's brief responding to these arguments. Neither did Schlagel, as it pointed out in its reply.

##### ii. The arguments as to Baldor. Baldor argues that Nationwide has no evidence, only conclusory assertions, that Baldor ever communicated any purported

express warranty to Midwest Farmers Cooperative regarding the bearing at issue in this case, either before or after its sale. Similarly, Baldor argues that Nationwide has no evidence that any purported express warranty was part of the basis of any bargain by which the bearing was sold or that Baldor breached any such promise.

In response to Baldor's motion for summary judgment on this claim, Nationwide argues that IOWA CODE § 554.2318 does not bar its express warranty claim against Baldor, because it was an end user to whom the warranty properly extends, even though Baldor made no such argument (Schlagel did). Nationwide argues that a jury could find that Schlagel relied upon Baldor to choose the proper bearing, because Baldor had toured Schlagel facilities and knew that its bearings were being used by Schlagel for bucket elevators, and knew that Schlagel was relying on Baldor for selection of the proper bearings and appropriate greasing instructions.

Nationwide also argues that a jury could find Baldor liable for breach of express warranty. Nationwide points to Baldor's advertisement of its bearing as having "exclusive sealing designs and features," such that the bearings' "rolling elements [are] never exposed to contaminants," and describing the R-seals as "keep[ing] contaminants out, lubricants in." Nationwide argues that these representations are critical, because the defendants argue that the bearing failure was caused by an under-lubricated and contaminated bearing. Nationwide also argues that Baldor's lubricating instructions implied that, if the bearing was lubricated according to the manual, then the bearing should not suffer catastrophic failure. However, Nationwide argues that it has generated genuine issues of material fact that the seal actually allowed in moisture and contaminants, causing the emulsification of the grease, and ultimately led to the events causing the explosion. Nationwide also asserts that the R-seal does not keep lubricants in, but leaks lubricants, while the bearing is running.

In reply, Baldor argues that Nationwide's arguments concerning the effect of IOWA CODE § 554.2318 are in response to arguments that it never made. Baldor also argues that Nationwide has now identified, for the first time, language purportedly constituting an express warranty by Baldor regarding the bearing, but that Nationwide has offered no evidence establishing that any such purported express warranty was part of the basis of the bargain for Schlagel's purchase of the bearing, as required to establish breach of an express warranty under Iowa law. Baldor also argues that there is no evidence that any express warranty was relied on by Schlagel or Midwest Farmers Cooperative.

### b. Analysis

*i.* ***The effect of § 554.2318***. For essentially the same reasons that I found that it was appropriate for me to grant Baldor summary judgment, *sua sponte*, on Nationwide's claim of breach of implied warranty of merchantability on the ground that the claim was untimely pursuant to IOWA CODE § 554.2725(2), it also would be appropriate for me to grant summary judgment in Baldor's favor, *sua sponte*, on the ground that Nationwide's express warranty claim is barred by IOWA CODE § 554.2318, which Baldor did not raise, if it is appropriate to grant summary judgment to Schlagel on this ground, which Schlagel did raise. Nationwide has had sufficient advance notice of this issue as to the express warranty claims involving goods against both Schlagel and Baldor and an adequate opportunity to demonstrate why summary judgment should not be granted, where Schlagel squarely presented the issue in its summary judgment motion, and Nationwide responded to the issue, albeit in its response to Baldor's motion for summary judgment, even though the issue was only raised in Schlagel's motion. *See Figg*, 433 F.3d at 597 ("*Sua sponte* orders of summary judgment will be upheld 'only when the "party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted."'" (quoting *Shur-Value*

*Stamps, Inc.*, 50 F.3d at 595, in turn quoting *Interco Inc.*, 900 F.2d at 1269; *Stone Motor Co.*, 400 F.3d at 607 ("A district court may grant summary judgment sua sponte if 'the losing party was on notice that she had to come forward with all of her evidence.'" (quoting *Celotex Corp.*, 477 U.S. at 326)); *Hubbard*, 994 F.2d at 531). Plainly, Nationwide understood that the question of whether § 554.2318 bars this claim applied to Baldor as well as to Schlagel. Just as plainly, it would be futile to consider the merits of this claim against Baldor, if the claim is barred by § 554.2318.

Although IOWA CODE § 554.2313, defining the circumstances that create an express warranty for goods, like other provisions of the U.C.C., is drafted to determine the rights and obligations of the immediate parties to a sales transaction, the Iowa Supreme Court has recognized that the U.C.C. also provides for "extended beneficiaries" in IOWA CODE § 554.2318. *Kolarik v. Cory Int'l Corp.*, 721 N.W.2d 159, 163 (Iowa 2006). Section 554.2318 states, "A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." IOWA CODE § 554.2318. Schlagel argues that, for § 554.2318 to apply to an extended beneficiary, that beneficiary must have been "injured" by the breach of warranty. Schlagel is correct that the Iowa Supreme Court observed that "Section 554.2318 does not extend its warranty protection to third party beneficiaries who have suffered only economic loss, because the term 'injured' has been interpreted by this court to include only '*physical harm* to the plaintiff or his property.'" *Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 129 (Iowa 1984) (quoting *Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 885 (Iowa 1983), with emphasis in the original). However, Nationwide does argue that its insured, Midwest Farmers Cooperative, suffered physical harm to its property, the Alton grain elevator,

because Schlagel's and Baldor's products did not meet their express warranties. Thus, there was no lack of "injury" that would bar Nationwide's claim pursuant to § 554.2318.

Even so, the extended beneficiaries who may seek relief for breach of an express warranty for goods are still limited, because the Iowa Supreme Court has held that they "do not include remote buyers seeking economic-loss damages." *Kolarik*, 721 N.W.2d at 163 n.3 (citing *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 108 (Iowa 1995), and *Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.*, 526 N.W.2d 305, 309 (Iowa 1995)). The Iowa Supreme Court explained this limitation more fully in *Tomka*, in which the plaintiff claimed lost profits for breach of express warranties regarding a hormone manufactured by the defendant that he had implanted in cattle that he was custom feeding:

> We have recently held that non-privity buyers cannot recover consequential economic loss damages under a theory of express warranty. *Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.*, 526 N.W.2d 305, 309-10 (Iowa 1995). This rule bars any recovery by Tomka under his express warranty theory.
>
> Whether a party is "in privity" with another party depends on whether they are parties to a contract. If the parties have contracted with each other, they are in privity. 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 11-2, at 528 (3d ed.1988) (hereinafter "White and Summers"). If they have not, they are not in privity. *Id.* White and Summers gives an example of a non-privity plaintiff as one who purchases a product but does not buy it directly from the defendant. *Id.*
>
> That is the situation we have here. Even if Tomka can be considered a buyer, he did not buy the product from the defendant manufacturer. He purchased Finaplix from the veterinarians. Therefore, Tomka was not in privity with Hoechst.

Additionally, the damages that Tomka seeks to recover are consequential economic loss damages. As we explained in *Beyond the Garden Gate*, "direct economic loss" damage is "'the difference between the actual value of the goods accepted and the value they would have had if they had been as warranted.'" *Beyond the Garden Gate, Inc.*, 526 N.W.2d at 309 (quoting White and Summers at 536). "Consequential economic loss" includes "'loss of profits resulting from the failure of the goods to function as warranted, loss of goodwill, and loss of business reputation.'" *Id.* Tomka seeks damages for lost profits and loss of good will. Therefore, his damages are consequential economic loss.

Because Tomka is at best a non-privity buyer and because he seeks to recover only consequential economic loss damages, he may not rely on a theory of breach of express warranty. *Id.* at 310. The trial court correctly directed a verdict for the defendant on this theory of liability.

*Tomka*, 528 N.W.2d at 107-08. Thus, the bar to recovery for breach of express warranty by an extended beneficiary turns on whether or not the extended beneficiary asserts a claim for "direct" or only "consequential" economic loss.

The Iowa Supreme Court explained the difference between these two types of economic loss in *Beyond the Garden Gate, Inc.* In that case, the Iowa Supreme Court noted that "direct economic loss" is defined in Iowa Code § 554.2714(2) as "'the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted.'" *Beyond the Garden Gate, Inc.*, 526 N.W.2d at 309. "Such losses are 'damage flowing directly from insufficient product quality.'" *Id.* (quoting White & Summers, Uniform Commercial Code § 11-5, 539 (3d ed. 1988)). On the other hand, "consequential economic loss" is defined in Iowa Code § 554.2715(2) as

> (a) any loss resulting from general or particular requirements
> and needs of which the seller at the time of contracting had
> reason to know and which could not reasonably be prevented
> by cover or otherwise; and
>
> (b) injury to person or property proximately resulting from any
> breach of warranty.

IOWA CODE § 554.2715(2). Thus, "consequential economic loss" includes "'loss of profits resulting from failure of the goods to function as warranted, loss of goodwill, and loss of business reputation,' and 'other loss proximately resulting from a defective product beyond direct economic loss.'" *Beyond the Garden Gate, Inc.*, 526 N.W.2d at 309 (quoting White & Summers, UNIFORM COMMERCIAL CODE § 11-5, 536, 539). The Iowa Supreme Court held in *Beyond the Garden Gate, Inc.*, "that nonprivity buyers who rely on express warranties are limited to direct economic loss damages." *Id.* at 310.

Midwest Farmers Cooperative was not in privity with either Schlagel or Baldor, because Midwest Farmers Cooperative did not buy Schlagel's or Baldor's products directly from them. *See Tomka*, 528 N.W.2d at 107 (explaining that a "non-privity buyer" is one who did not buy the product directly from the manufacturer). Midwest Farmers Cooperative bought Schlagel's elevator leg through SMA, and bought Baldor's bearings even less directly through SMA, Schlagel, and GEECO. Moreover, Nationwide's breach of express warranty claim does not seek "direct economic loss" in the form of the difference between the value of the goods accepted and the value they would have had if they had been as warranted. *See Beyond the Garden Gate, Inc.*, 526 N.W.2d at 309. Rather, Nationwide seeks to recover Midwest Farmers Cooperative's damages to property, the Alton grain elevator, which are plainly "consequential economic loss damages." *Id.*; IOWA CODE § 554.2715(2)(b). Consequently, Nationwide's breach of express warranty claims against Schlagel and Baldor fall beyond the scope of remote buyers' claims

authorized by Iowa Code § 554.2318.  The decision in *Midland Forge, Inc. v. Letts Industries, Inc.*, 395 F. Supp. 506, 511 (N.D. Iowa 1975), on which Nationwide relies simply is not to the contrary, as it antedates the Iowa Supreme Court's clarification of the scope of remote buyers' claims authorized by Iowa Code § 554.2318.

Schlagel and Baldor are entitled to summary judgment on Nationwide's express warranty claims on this ground.  Nevertheless, I will also consider these defendants' other arguments for summary judgment.

*ii.      Schlagel's other grounds for summary judgment.*  Nationwide failed to meet, or even to attempt to meet, its burden as the non-movant resisting summary judgment on the merits of its claim of breach of express warranty against Schlagel. Nationwide must go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik*, 47 F.3d at 957)).  Nationwide simply did not do so, by failing to respond at all to Schlagel's challenges to the existence of evidence supporting the claim on the merits.  Therefore, Schlagel is entitled to summary judgment on Nationwide's claim of breach of express warranty against it on this alternative ground.

*iii.      Baldor's other grounds for summary judgment.*  Although it made no such effort to marshal evidence to support its claim of breach of express wararanty against Schlagel, Nationwide has tried to marshal evidence to support its claim of breach of express warranty against Baldor.  Thus, I must consider whether that claim can survive summary judgment on the merits, if it is not barred as explained above.

Iowa Code § 554.2313 explains how an express warranty for goods is created, as follows:

1.  Express warranties by the seller are created as follows:

    a.  Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

    b.  Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

    c.  Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

2.  It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

IOWA CODE § 554.2313.

Nationwide argues that Baldor created express warranties in its advertising materials. There is authority for the proposition that advertising materials can be the basis for an express warranty, but only if the other elements of the claim, including reliance, are met. *See, e.g., Midland Forge, Inc.*, 395 F. Supp. at 511 ("Express warranties can be made by distributing advertising literature which contains factual representations relied upon by the ultimate purchaser, even though the latter is not in privity with the manufacturer who made the statements." (citing IOWA CODE § 554.2313 and Iowa and New York decisions)); *see also Select Pork, Inc. v. Babcock Swine, Inc.*, 640 F.2d 147,

149 (8th Cir. 1981). Thus, for a plaintiff to prove a breach of an express warranty based on sales representations, there must be a finding the sale would not have been made but for the representations. *Dailey v. Holiday Distrib. Corp.*, 260 Iowa 859, 869, 151 N.W.2d 477, 484 (1967). Moreover, under section 554.2313(1)(a), an express warranty must serve as part of the "basis of the bargain." *Moore v. Vanderloo*, 386 N.W.2d 108, 112 (Iowa 1986). In short, Nationwide would have to prove the following: (1) that Baldor created an express warranty with its sales literature; (2) Midwest Farmers Cooperative (or its predecessor) relied on that express warranty; (3) the bearing failed to live up to or conform to the express warranty; and (4) Midwest Farmers Cooperative suffered damages proximately caused by the breach of express warranty. *Cf. Etchen v. Holiday Rambler Corp.*, 574 N.W.2d 355, 359 (Iowa Ct. App. 1997); Iowa Model Civil Jury Instruction 1100.1.

I agree with Baldor that Nationwide has offered no evidence establishing that any express warranty in the sales literature was part of the basis of the bargain for Schlagel's purchase of the bearing, or otherwise relied upon by Schlagel or Midwest Farmers Cooperative, as required to establish breach of an express warranty under Iowa law. Nationwide's purported evidence of reliance—that Baldor had toured Schlagel facilities and, thus, knew that its bearings were being used by Schlagel for bucket elevators and that Schlagel was relying on Baldor for selection of the proper bearings and appropriate greasing instructions—does nothing to raise an inference of reliance *by Schlagel*, or the ultimate buyer, Midwest Farmers Cooperative, on the purported express warranties in the sales literature, because it suggests only what Baldor knew, not what Schlagel or Midwest Farmers Cooperative relied upon. *See, e.g., Midland Forge, Inc.*, 395 F. Supp. at 511 (holding that an ultimate purchaser can assert an express warranty claim based on

advertising literature if it contains factual representations relied upon by the ultimate purchaser).

Thus, Baldor is also entitled to summary judgment on this claim on this alternative ground.

## E. Breach Of Contract

Nationwide has asserted a breach-of-contract claim only against SMA (Division VI of the Fourth Amended Complaint). SMA seeks summary judgment on that claim.

### 1. Arguments of the parties

SMA's argument for summary judgment on the breach-of-contract claim against it is surprisingly brief. SMA argues that Nationwide has failed to allege a violation of a single term of the contract between SMA and Midwest Farmers Cooperative. Instead, SMA asserts that Nationwide alleges that SMA violated its contractual duty (1) to construct an elevator that was safe for use, (2) to construct an elevator that was intended for the purpose of safely handling grain, and (3) to use components that were "state of the art." SMA points out that none of these obligations is contained in the contract, which sets out the parameters for construction of the elevator in technical building terms. SMA argues that, here, Midwest Farmers Cooperative and SMA were sophisticated enough to add all necessary and important terms into a contract for a multi-million dollar grain elevator, which indicates their intent not to add duties and obligations for either party outside of the written terms of the contract. SMA argues that, because Nationwide cannot point to a term of a contract allegedly breached by SMA, Nationwide cannot generate a genuine issue of material fact on its breach-of-contract claim, and SMA is, therefore, entitled to summary judgment on that claim.

In its response, Nationwide does not challenge SMA's description of the alleged breaches of the contract. Nationwide argues, however, that there are jury questions on its breach-of-contract claim. Nationwide argues that SMA has admitted that the "contract" was merely a preliminary document to lock SMA in for the start of the design. Nationwide contends that the design of the elevator was not complete until after the original contract was signed and that SMA admits that there were other documents pertaining to its duty, but that they have not been produced in this case by any party. Nationwide argues that, consistent with RESTATEMENT (SECOND) OF CONTRACTS § 202, to determine the parties' intent, a preliminary contract must be interpreted in the context of the parties' course of dealing, preliminary negotiations, course of performance, and buyer expectations. Here, Nationwide argues that the established purpose of the contract was to design and construct a reasonably safe-to-operate grain elevator. Nationwide also argues that the contract was not "integrated," because SMA admits that it was only preliminary; indeed, it was simply a bid that refers only to conceptual drawings; there is no merger or integration clause in the document; the document is missing essential terms relating to quality and safety features one would expect in a multi-million dollar state-of-the-art facility; and the parties' course of dealing confirms that adequate safety features were expected.

In reply, SMA argues that Nationwide's attempts to create fact questions are contradicted by the express agreement between SMA and Midwest Farmers Cooperative. SMA asserts that Exhibit 1055 (SMA Appendix at 145-56) describes itself as a contract, not a "preliminary" contract. SMA also argues that it is undisputed that neither SMA nor Midwest Farmers Cooperative is in possession of any other agreements or documents regarding the construction of the elevator and the intent of the parties. Thus, SMA argues that Exhibit 1055 *is* the agreement between the parties. SMA argues that Nationwide's brief is devoid of any discussion of the interpretation of any provision of the contract and,

instead, attempts to add additional terms to the contract with extrinsic evidence. Moreover, SMA argues that Nationwide is trying to bootstrap its defect and implied warranty claims into the breach-of-contract claim without citing any provision of the contract that was purportedly breached. SMA contends that Nationwide is not seeking to add any implied terms that are necessary to the contract, just vague notions of safety that cannot be found in the written contract. Thus, SMA argues that Nationwide's claim is really more akin to a claim of breach of warranty than a claim of breach of contract.

## 2. *Analysis*

The Iowa Supreme Court has stated the elements of a breach-of-contract claim as follows:

> In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). "A breach of a contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract." *Magnusson Agency v. Public Entity Nat. Co.-Midwest*, 560 N.W.2d 20, 27 (Iowa 1997).

I find the Iowa Supreme Court's decision in *Horsfield Construction, Inc. v, Dubuque County, Iowa*, 653 N.W.2d 563 (Iowa 2002), to be instructive on whether Exhibit 1055, which SMA characterizes as the contract and Nationwide characterizes as a bid, is *the contract*, as SMA asserts, or simply a non-integrated *preliminary agreement*, as Nationwide contends, because that case, like this one, presents the question of whether

the buyer's approval of a contractor's bid constituted a binding contract. *See Horsfield Construction*, 653 N.W.2d at 570. As the Iowa Supreme Court explained in that case,

> This court has adopted Restatement (Second) of Contracts, section 27, which provides:
>
>> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.
>
> Restatement (Second) of Contracts § 27 (1981); *Faught v. Budlong*, 540 N.W.2d 33, 35 (Iowa 1995). Comments *a* and *b* to section 27 are critical to an understanding of this general rule. Comment *a* provides:
>
>> Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by *exchange of several writings*. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, *they have then concluded the contract*.
>
> Restatement (Second) of Contracts § 27 cmt. *a* (emphasis added); *Faught*, 540 N.W.2d at 35.
>
>> Comment *b* provides:
>>
>> On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary

> negotiations and agreements do not constitute a contract.

Restatement (Second) of Contracts § 27 cmt. *b*; *Faught*, 540 N.W.2d at 35.

> Factors that bear on whether a contract has been concluded include the following:

>> the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations.

Restatement (Second) of Contracts § 27 cmt. *c*; *Faught*, 540 N.W.2d at 36.

> It is undisputed in this case that HCI's bid was an offer to do the work as outlined in the County's plans and specifications. The bid was specific as to (1) the start date (two weeks after the award of contract), (2) the number of working days to complete the project (80), and (3) the consideration (the per unit price and total price for each bid item was set forth in the bid). Additionally, each bid item was cross-referenced in the County's engineering plans and further referenced in the Blue Book. The record shows that the parties would not be agreeing to any new terms or conditions upon signing a formal contract.

> The Board's October 7 letter was unconditional. It approved HCI's bid with no mention that its approval was subject to a written contract to be entered into later. *See Jameson v. Joint Drainage Dist.*, 191 Iowa 920, 922 183 N.W. 512, 513 (1921) ("acceptance of a bid or proposal to enter into a contract, to be binding upon the parties, must be absolute and unconditional"). Significantly, in re-bidding the project the County revised its proposal form to include the

following language: "Acceptance of a bid by the county is subject to confirmation and review and no contract enforceable by the bidder is created until execution of a written contract by all parties." *See Delta Democrat Publ'g Co. v. Bd. of Public Contracts*, 224 Miss. 848, 81 So.2d 715, 716-17 (Miss.1955) (acceptance of low bid was expressly made subject to bidder executing contract; held that bidder's refusal to enter contract as written allowed governing body to reject bid).

In short, the "contract" document that was to follow was a mere formality and redundant to HCI's bid and the Board's October 7 approval. Moreover, before the Board's unconditional approval, there was no evidence indicating that either party considered something further had to be done to make the contract complete. In its October 7 approval, the Board left no doubt that it believed an agreement had been reached when it commented: "We look forward to working with you and understand that you can begin some work on the project yet this fall."

In reliance on the Board's acceptance of its bid, HCI purchased a portable cement mix plant with accessories for $203,000. It also purchased a John Deere rubber tire end loader for approximately $95,000. Additionally, HCI contacted providers of materials and other subcontractors. There was testimony from HCI representatives that the company would not have taken these steps without the approval of its bid by the Board.

All of these facts are undisputed and lead us to conclude as a matter of law that the parties intended to be bound when the Board accepted HCI's bid and that the written contract called for by the statute was intended only as a memorial of their agreement.

*Horsfield Construction*, 653 N.W.2d at 570-72.

I conclude that Exhibit 1055, like the "bid" and unconditional acceptance in *Horsfield*, was, and was intended by the parties to be, the complete and binding contract between SMA and Midwest Farmers Cooperative. The document is denominated "*FORM*

*OF AGREEMENT BETWEEN OWNER AND CONTRACTOR*" and shows approval by Midwest Farmers Cooperative of SMA's bid with only conditions unrelated to the terms of the agreement and no indication that Midwest Farmers Cooperative's approval was subject to some further written contract or documents to be entered into later. *See* SMA's Appendix at 145 (Exhibit 1055 at 1); *and compare Horsfield*, 653 N.W.2d at 571. The only conditions on Midwest Farmers Cooperative's "award" of the contract to SMA and agreement "on all terms listed in the contract documents" was that the agreement was "[s]ubject to DOT, Railroad Permits and Final Lender Approval." *Id.* Moreover, the bid was specific as to cost "[f]or the complete work specified in the contract documents," which "contract documents" are attached as subsequent pages, without reference to other documents to define terms of the agreement. *Id.*; *and compare Horsfield*, 653 N.W.2d at 571. The bid also states numerous specifications, including capacity of the elevator for receiving, drying, and shipping grain; construction materials for the storage facility and roof sealant; storage capacities; compliance with OSHA access requirements; sewer and water access; the location for hook up of adequate electric power and natural gas or propane; conditions at the start of construction; excavation and storage; and exclusions of parking lots, roads and general site work, railroad beds or rails from the contractor's work. *Id.* at 146-47; *and compare Horsfield*, 653 N.W.2d at 571. Indeed, the bid is even more specific as to the "scope of work" and precise specifications for the receiving area; scalping; screening; distributor; shipping leg; shipping screener; rail reclaim; bin reclaim; shipping scale; automatic sampler; rail chute; sample office; shipping office; manlift; aeration; grain dryer; temperature system; high bin indicator; oil system; dust system; and painting. Nothing suggests that any other contract documents were to follow. *Cf. Horsfield*, 653 N.W.2d at 571 (a formal written contract to follow, as required by statute, was a "mere formality"). Indeed, as SMA points out, the parties have not produced any

other documents that they argue are parts of or were integrated into a complete contract. A reference to "conceptual drawings," *see* SMA's Appendix at 145 (Exhibit 1055 at 1), does not suggest, as Nationwide argues, that additional terms of the contract were anticipated. Nationwide mistakes the possibility of more specific design documents for the possibility of more specific contract documents, but only the former is suggested. It is also clear that, in reliance on this contract, SMA did the work of designing and constructing the Alton grain elevator. *Horsfield*, 653 N.W.2d at 571-72.

I also find that Nationwide has failed to generate any genuine issues of material fact that the contract was not integrated, even though whether the contract is integrated is a question of fact to be determined from the totality of the evidence. *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011). "When the parties adopt a writing or writings as the final and complete expression of their agreement, the agreement is fully integrated." *Id.* Whether or not the contract contains an integration clause is only one factor to be taken into account, not the sole determining factor. *Id.* Thus, the lack of an integration clause in Exhibit 1055 does not necessarily suggest that the agreement is not integrated. Moreover, "[w]here the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing does not constitute a final expression." RESTATEMENT (SECOND) OF CONTRACTS § 209(3). As noted above, here, Exhibit 1055 appears to be the complete agreement in terms of its completeness and specificity. *Id.* Nationwide has offered nothing to suggest that Exhibit 1055 does not constitute a final expression of the parties' agreement. While Nationwide asserts that the document is missing essential terms relating to quality and safety features one would expect in a multi-million dollar state-of-the-art facility and that the parties' course of dealing confirms that adequate safety features were expected, this is

an example of 20/20 hindsight and an attempt to use parol evidence to add to or change the terms of an integrated agreement, not an argument that Exhibit 1055 was not an integrated agreement. *See Whalen v. Connelly*, 545 N.W.2d 284, 290-91 (Iowa 1996) ("When an agreement is deemed fully integrated, the parol evidence rule prevents the receipt of any extrinsic evidence to contradict (or even supplement) the terms of the written agreement." (citing RESTATEMENT (SECOND) OF CONTRACTS § 213 (1981)).

Conspicuous by their absence from the fully integrated contract between SMA and Midwest Farmers Cooperative are any terms requiring SMA (1) to construct an elevator that was safe for use, (2) to construct an elevator that was intended for the purpose of safely handling grain, and (3) to use components that were "state of the art." While I found, above, that there were genuine issues of material fact as to whether similar matters were the subject of express warranties, I do not find any genuine issue of material fact that they were terms of the contract. Because Nationwide has failed to generate genuine issues of material fact that these matters were terms of the contract, *see Molo Oil Co.*, 578 N.W.2d at 224 (the first two elements of a breach-of-contract claim are (1) the existence of a contract; and (2) the terms and conditions of the contract), Nationwide's claim for breach of contract against SMA fails as a matter of law.

SMA is entitled to summary judgment on Nationwide's breach-of-contract claim.

## III. CONCLUSION

Upon the foregoing,

1.      Defendant Baldor's May 2, 2011, Motion For Summary Judgment (docket no. 133) is **granted in part and denied in part**, as follows:

      a.      The motion is **denied** on Nationwide's product defect claims alleging warning defects, but **granted** on Nationwide's product defect claims alleging design

and manufacturing defects, against Baldor in Division XII of Nationwide's Fourth Amended Complaint.

b. The motion is **granted** on the merits of Nationwide's claim of breach of the implied warranty of merchantability against Baldor in Division XIII of Nationwide's Fourth Amended Complaint, because summary judgment was granted on Nationwide's design defect claim in Division XII of Nationwide's Fourth Amended Complaint.

c. The motion is **granted** on the merits of Nationwide's claim of breach of the implied warranty of fitness for a particular purpose against Baldor in Division XIV of Nationwide's Fourth Amended Complaint.

d. The motion is **granted** on Nationwide's claim of breach of the implied warranty of workmanlike manner against Baldor in Division XV of the Fourth Amended Complaint.

e. The motion is **granted** on Nationwide's claim of breach of express warranties against Baldor in Division XVI of Nationwide's Fourth Amended Complaint.

2. In addition or in the alternative, summary judgment is also **granted** to Baldor, *sua sponte*, on the following claims:

a. The claim of breach of the implied warranty of merchantability against Baldor in Division XIII, because such claim is untimely.

b. The claim of implied warranty of fitness for a particular purpose against Baldor in Division XIV, because such claim is also untimely.

c. The claim of breach of express warranty, because such claim against Baldor falls beyond the scope of remote buyers' claims authorized by Iowa Code § 554.2318.

3.     Defendant SMA's May 2, 2011, Motion For Summary Judgment (docket no. 137) is **granted in part and denied in part**, as follows:

a.     The motion is **granted** on Nationwide's product defect claims relating to the elevator as a whole, because the elevator as a whole is not a "product," and as to product defect claims in Division I of the Fourth Amended Complaint relating to the bearing, the hazard warning system, and elevator leg, because SMA is entitled to the statutory protection from such claims provided by Iowa Code § 613.18.   On the other hand, SMA did not seek and is not entitled to summary judgment on those portions of Division I that I have identified herein as asserting negligence claims.   *See* Fourth Amended Complaint, ¶¶ 17(2)(g), 17(2)(n), 17(3)(c), 17(4)b), 17(4)(c), 17(4)(d), and 17(4)(e).

b.     The motion is **granted** as to the breach of the implied warranty of merchantability against SMA in Division II of the Fourth Amended Complaint, because SMA is also entitled to the statutory protection from such claims provided by Iowa Code § 613.18.

c.     The motion is **granted** as to the claim of breach of the implied warranty of fitness for a particular purpose against SMA in Division III of the Fourth Amended Complaint.

d.     The motion is **denied** as to the claim for breach of implied warranty of workmanlike manner against SMA in Division IV of the Fourth Amended Complaint.

e.     The motion is **denied** as to the claim of breach of express warranties against SMA in Division V of the Fourth Amended Complaint.

f.     The motion is **granted** as to the claim of breach of contract against SMA in Division VI of the Fourth Amended Complaint.

4.     Defendant Schlagel's May 2, 2011, Motion For Partial Summary Judgment (docket no. 139) is **granted** on each of the challenged claims, as follows:

a.     The motion is **granted** on Nationwide's manufacturing defect and installation defect claims against Schlagel in Division VII of Nationwide's Fourth Amended Complaint.  (Schlagel did not seek summary judgment on the warning or design defect claims against it.)

b.     The motion is **granted** on Nationwide's claim of breach of the implied warranty of merchantability against Schlagel in Division VIII of Nationwide's Fourth Amended Complaint.

c.     The motion is **granted** on Nationwide's claim of breach of the implied warranty of fitness for a particular purpose against Schlagel in Division IX of Nationwide's Fourth Amended Complaint.

d.     The motion is **granted** on Nationwide's claim for breach of implied warranty of workmanlike manner against Schlagel in Division X of Nationwide's Fourth Amended Complaint.

e.     The motion is **granted** on Nationwide's claim of breach of express warranties against Schlagel in Division XI of Nationwide's Fourth Amended Complaint.

5.     Thus, this case will proceed to trial on the following claims:

a.     Those portions of Division I of Nationwide's Fourth Amended Complaint that I have identified herein as asserting negligence claims against SMA, *see* Fourth Amended Complaint, ¶¶ 17(2)(g), 17(2)(n), 17(3)(c), 17(4)b), 17(4)(c), 17(4)(d), and 17(4)(e); the claim for breach of implied warranty of workmanlike manner against SMA in Division IV of the Fourth Amended Complaint; and the

claim of breach of express warranties against SMA in Division V of the Fourth Amended Complaint.

      b.     Nationwide's product defect claims against Schlagel alleging warning and design defects in Division VII of the Fourth Amended Complaint.

      c.     Nationwide's product defect claims against Baldor alleging warning defects in Division XII of the Fourth Amended Complaint.

**IT IS SO ORDERED.**

**DATED** this 29th day of August, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA